Michael A. CREEL, Albert M. Zimmerebner, and Robert N. Jones, Appellants,

v.

HOUSTON INDUSTRIES, INC. d/b/a Reliant Energy, Inc., Appellee.

Houston Industries, Inc. d/b/a Reliant Energy, Inc., Appellant,

v.

Michael A. Creel, Albert M. Zimmerebner, and Robert N. Jones, Appellees.

No. 01–02–01076–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 6, 2003.

Felicia Harris Kyle, Joe W. Redden, Jr., Beck, Redden & Secrest, L.L.P., Houston, Jeffrey D. Kyle, Asst. Dist. Atty., Angleton, Gary Martin Jewell, William W. Rucker, Houston, for Appellants.

Amy Douthitt Maddux, Maria Wyckoff Boyce, Judy Yi–Li Liu, Macey Reasoner Stokes, Baker & Bolts, L.L.P., Houston, for Appellees.

Panel consists of Justices HEDGES, NUCHIA, and HANKS.

## OPINION

ADELE HEDGES, Justice.

In this appeal from a final summary judgment, the central issue is whether the trial court erred in determining as a matter of law that appellant/appellee Houston Industries, Inc. d/b/a Reliant Energy, Inc. ("Reliant") correctly computed the amount of severance compensation paid to appellants/appellees Michael Creel, Albert Zimmerebner, and Robert Jones (sometimes collectively called "the plaintiffs") under the severance agreements that are the subject of this dispute. The secondary issues are whether the trial court erred in rendering summary judgment (1) in favor of Reliant on Creel's tort claims and (2) in favor of the plaintiffs for their attorneys' fees incurred in the litigation, whether or not the plaintiffs prevailed in the litigation and subsequent appeals.

We affirm.

## Background

### 1. *The Severance Agreements*

The plaintiffs are former executives with NorAm Energy Corp. ("NorAm") or its subsidiaries. On or about July 16, 1996, in anticipation of a probable merger by NorAm with Houston Industries, Inc., all three plaintiffs entered into separate, but substantially similar, severance agreements with NorAm.

The severance agreements provided that, if a "Change in Control" occurred at NorAm during the "Severance Period," and if the signatory executive was terminated, the signatory executive would receive the severance compensation set forth in section 5 of the agreements. Additionally, if the signatory executive terminated his employment during the Severance Period because one or more enumerated events had occurred, the signatory executive would also receive the section 5 severance compensation.

Under section 5, the terminated executive was entitled to receive:

in a single lump sum, an amount equal to 2.99 times the sum of (A) Base Pay (at the highest rate in effect for any period prior to the Termination Date) plus (B) Incentive Pay (determined in accordance with the standards set forth in Section 1(h)).

Section 1(h) of the severance agreements defined "Incentive Pay" as follows:

"Incentive Pay" means *an annual amount* equal to *not less than the annual bonus that would have been paid for the year in which the Change in Control occurred* if the performance goals had been achieved at the opportunity (*i.e.*, maximum) level, *pursuant to any bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement* (whether or not funded) of the Company

[NorAm], or any successor thereto providing benefits at least as great as the benefits payable thereunder prior to a Change in Control.

(Emphasis added.)

The severance agreements also provided that if the signatory executive was required to incur legal fees to enforce his rights under the agreement, NorAm (or its successor) would be obligated to pay such legal fees. To secure such payment, the severance agreements required NorAm (or its successor) to fund a trust account. Section 8 of the severance agreements provided:

(a) It is the intent of the Company that the Executive *not be required to incur legal fees and the related expenses associated with the interpretation, enforcement or defense of Executive's rights under this Agreement* by litigation or otherwise because the cost and expense thereof would substantially detract from *the benefits intended to be extended to the Executive hereunder.* Accordingly, *if it should appear to the Executive that the Company has failed to comply with any of its obligations under this Agreement* or in the event that the Company or any other person takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, the Executive the benefits provided or intended to be provided to the Executive hereunder, *the Company irrevocably authorizes the Executive from time to time to retain counsel of Executive's choice, at the expense of the Company as hereafter provided, to advise and represent the Executive in connection with any such interpretation, enforcement or defense, including without limitation the initiation* or defense *of any litigation* or other legal action, whether by or

*against the Company* or any director, officer, stockholder or other person affiliated with the Company, in any jurisdiction. . . . *Without respect to whether the Executive prevails, in whole or in part, in connection with any of the foregoing, the Company will pay and be solely financially responsible for any and all attorneys' and related fees and expenses incurred by the Executive in connection with any of the foregoing.*

(b) *Without limiting the obligations of the Company* pursuant to Section 8(a), in the event a Change in Control occurs, *the performance of the Company's obligations under this Section 8 will be secured by amounts deposited or to be deposited in trust pursuant to certain trust agreements to which the Company will be a party* . . . . Any failure by the Company to satisfy any of its obligations under this Section 8(b) will not limit the rights of the Executive hereunder. Subject to the foregoing, the Executive will have the status of a general unsecured creditor of the Company and will have no right to, or security interest in, any assets of the Company or any Subsidiary.

(Emphasis added.)

2. *Merger and Termination*

On August 6, 1997, NorAm and its subsidiaries completed a merger with Houston Industries, which was later renamed Reliant Energy, Inc. It is undisputed that Reliant assumed NorAm's obligations under the severance agreements and under the trust agreements. It is also undisputed that Creel, Zimmerebner, and Jones were terminated and entitled to severance compensation under their respective severance agreements.[1] What is disputed is whether Reliant paid all the severance compensation due the plaintiffs under their respective agreements.

At the time of their respective terminations, Reliant paid a lump sum to each plaintiff under section 5 of the severance agreements, based on its interpretation of what was meant by "annual amount" in the definition of "Incentive Pay" under section 1(h) of the severance agreements.[2] According to Reliant, whether the "Incentive Pay" came under NorAm's annual incentive plan or under Reliant's short-term incentive plan that replaced it, the "annual amount" consisted of the annual cash bonus that was paid, and did not include the value of restricted stock or stock options that were long-term or multi-year compensation.

3. *Litigation*

In December 1999, Jones filed suit against Reliant seeking a declaratory judgment interpreting the term "Incentive Pay" under his severance agreement and asserting a cause of action for breach of contract based on the argument that Reliant had not paid him all the severance benefits to which he was entitled and had refused to pay his attorneys' fees incurred in connection with his pursuit of his severance compensation. Generally speaking, he argued that, for purposes of determining his lump sum severance compensation, the term "Incentive Pay" included not only the annual bonus but also the value of long-term incentive benefits that were awarded "under any bonus, incentive, profit-sharing, performance, discretionary pay

---

1. Creel was terminated at the time of the merger in 1997 and never became an employee of Reliant. It appears that after the merger, the incentive plans of Reliant replaced those of NorAm. Zimmerebner and Jones became employees of Reliant. Zimmerebner was terminated in July 1998 and Jones, in June 1999.

2. There is no dispute concerning "Base Pay" or the multiplier of 2.99.

or similar agreement, policy, plan, program or arrangement."

Creel and Zimmerebner intervened in the lawsuit in August and October 2001, respectively, asserting the same breach of contract claims as Jones. Creel and Zimmerebner later amended their petitions to include negligence claims.[3]

4. *Facts Underlying the Tort Claims*

The following facts appear to be undisputed: In 1989, Arkla, Inc. (a predecessor of NorAm), created two trusts. Both trusts were governed and construed under Missouri law, and the trustee of both was a trust company located in St. Louis, Missouri. Trust Agreement No. 1 assured the payment of amounts under certain employment, severance, retirement, income, income deferral, death, survivor, and/or other agreements. Trust Agreement No. 2 was established to fund certain legal fees and other expenses associated with lawsuits brought on behalf of the beneficiaries of NorAm covered by Trust Agreement No. 1. Reliant used Trust Agreement No. 2 to satisfy its obligation under section 8(b) of the severance agreements to establish a trust. As a successor to NorAm, Reliant is a party to Trust Agreement No. 2; the plaintiffs are trust beneficiaries.[4]

Trust Agreement No. 2 appears to contemplate that a person seeking payment of legal fees under a severance agreement will first submit a claim to Reliant. If Reliant does not pay the claim within 30 days, the claim may be submitted to the trustee for payment. Before payment, the trustee submits the claim to review counsel.[5] There is a preliminary approval process, and Reliant receives a copy of review counsel's preliminary approval. However, Trust Agreement No. 2 contains no provision allowing Reliant to prevent review counsel from approving a claim or the trustee from paying it. Trust Agreement No. 2 requires review counsel to approve requests for expenses unless (1) the request did not receive preliminary approval or (2) in the sole judgment of review counsel, it appears that the underlying claim is not eligible for reimbursement, is not meritorious, or is not being pursued in manner consistent with the nature and magnitude of the claim.

The decision of review counsel to pay a claim is final, and the trustee may rely on that decision for all purposes. Reliant is obligated to indemnify and hold harmless the trustee and review counsel against any damages, losses, claims, or expenses incurred arising out of their performance of their duties, unless arising out of their gross negligence or wilful misconduct.

It appears undisputed that in July 2001, Creel submitted a request for reimbursement of his legal fees to review counsel. Reliant opposed reimbursement on two grounds: (1) Creel's underlying claim was not meritorious, and (2) Creel was not listed on Exhibit A. Review counsel denied Creel's request on the sole ground that he was not listed on Exhibit A.[6] Approximate-

---

**3.** Zimmerebner has not asserted error with respect to the summary judgment on his negligence claims.

**4.** Under Trust Agreement No. 2, trust beneficiaries are "Participants" as that term is defined in Trust Agreement No. 1, although they are referred to as "Indemnities" in Trust Agreement No. 2. "Participants" under Trust Agreement No. 1 are current and former employees of the Company [Arkla and its succes-

sors] listed on Exhibit A to Trust Agreement No. 1. It appears that the Exhibit A list may be amended under certain conditions.

**5.** The name of review counsel is set forth in Trust Agreement No. 2; it is a law firm in St. Louis, Missouri.

**6.** Review counsel's letter denying the claim also stated: "Whether the Company had a duty to amend Exhibit A to include Mr. Creel

ly six months later, Reliant determined that Creel's name should have been added to Exhibit A and so advised review counsel. Review counsel subsequently advised counsel for the parties that Creel's claim was being reconsidered. Neither the record nor the briefs reveal the result of any such reconsideration.

Creel amended his petition in March 2002 to add claims for negligence and tortious interference against Reliant. Creel argued that Reliant was negligent in failing to include his name as a trust beneficiary and tortiously interfered with his right to receive reimbursement from the trust for his legal fees.

### 5. *Motions for Summary Judgment*

Ultimately, the plaintiffs each filed a motion for partial summary judgment on the attorneys' fees issue. The parties, Reliant on the one hand and the plaintiffs on the other, filed cross-motions for summary judgment concerning the interpretation of "Incentive Pay." Reliant's motion also sought summary judgment on the negligence and tortious interference claims.

### 6. *Final Judgment*

On October 1, 2002, the trial court signed a final judgment, as follows:

(1) Reliant's motion for summary judgment against the plaintiffs on their claims of breach of contract arising from the calculation and payment of the plaintiffs' severance benefits was granted (without specifying its reasons), and it was ordered that the plaintiffs take nothing on their breach of contract claims.

(2) Jones's motion for summary judgment and Creel and Zimmerebner's motion for partial summary judgment on their claims of breach of contract arising

from the calculation and payment of the plaintiffs' severance benefits were denied (without specifying its reasons).

(3) Reliant's motion for summary judgment against Creel and Zimmerebner on Creel's claims of negligence and tortious interference and Zimmerebner's claims of negligence was granted (without specifying its reasons), and it was ordered that Creel and Zimmerebner take nothing on these claims.

(4) The breach of contract, negligence, and tortious interference claims were dismissed with prejudice.

(5) Reliant's motion for summary judgment was denied with respect to the plaintiffs' breach of contract claims related to payment of their attorneys' fees. The plaintiffs' motions for reconsideration of the order denying their motions for partial summary judgment regarding attorneys' fees were granted. Reliant was ordered to pay the attorneys' fees of Jones, Creel, and Zimmerebner incurred in the prosecution of the suit through the completion of any and all appeals and regardless of whether the plaintiffs prevailed in their claims. However, Reliant would only be so obligated to the extent that the Trust had not or would not pay such attorneys' fees.

This appeal followed.

### *Standard of Review*

We follow the usual standard of review for an order granting one party's motion for summary judgment and denying the other parties' motions for summary judgment under TEX.R. CIV. P. 166a(a), (b). *See Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001) (summary judgment order not specifying grounds); *FM Prop-*

---

as a participant is not for us to decide in our role as Review Counsel. Nor would it be appropriate for us to impose a payment obligation on the Trust as a consequence of any failure of the Company to make certain amendments to the Trust."

*erties Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000) (order granting and denying cross-motions for summary judgment); *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997) (standard of review and burden under rule 166a(a), (b)). We also follow the usual standards for reviewing an order granting a motion for summary judgment. *See Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.,* 994 S.W.2d 830, 834 (Tex.App.-Houston [1st Dist.] 1999, no pet.).

**Summary Judgment on the Interpretation of "Incentive Pay"**

The first issue the plaintiffs present for this Court's review is whether the trial court erred in granting Reliant's motion for summary judgment, and in denying their motions for summary judgment, on their breach of contract claims, thereby affirming Reliant's method of calculating "Incentive Pay."

Here, as in the trial court, both the plaintiffs and Reliant argue that there are no material issues of fact and that the severance agreements are unambiguous. Nonetheless, they sharply disagree over how to interpret the language surrounding the term "Incentive Pay."

 The mere fact that the parties disagree about the meaning of a contract does not make an otherwise straightfor-

ward contract ambiguous. *Transcontinental Gas Pipeline Corp. v. Texaco, Inc.,* 35 S.W.3d 658, 665 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). Nor does an ambiguity arise just because the parties' respective interpretations are sharply conflicting. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996); *Transcontinental Gas Pipeline Corp.,* 35 S.W.3d at 665. We accept the parties' characterization of the severance agreements as unambiguous, as did the trial court.[7]

 Therefore, our primary concern is to ascertain the true intent of the parties as expressed within the four corners of the severance agreements. *See National Union Fire Ins. Co.,* 907 S.W.2d at 520; *see also White v. White,* 830 S.W.2d 767, 769 (Tex.App.-Houston [1st Dist.] 1992, writ denied) (interpretation of contract is controlled by parties' intentions as expressed within four corners of agreement). In interpreting the severance agreements, we examine them in their entirety in an effort to harmonize and give effect to all their provisions so that none will be meaningless. *See MCI Telecomm. Corp. v. Texas Utils. Elec. Co.,* 995 S.W.2d 647, 652 (Tex. 1999); *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995). If a contract term is not defined, it will be given its plain, ordinary, and generally accepted meaning. *DeWitt County Elec. Co-*

---

7. Accordingly, we do not consider the parties' interpretation of the agreements or extraneous evidence to determine their meaning. *See National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995) (only if contract is first determined to be ambiguous may court consider parties' interpretation and admit extraneous evidence to determine true meaning of instrument); *4N Int'l, Inc. v. Metropolitan Transit Auth.,* 56 S.W.3d 860, 862 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (same). Nor will we construe the language in the unambiguous severance agreements against Reliant, the successor to the

drafter. *See Autobond Acceptance Corp. v. Progressive Northern Ins. Co.,* 76 S.W.3d 489, 493 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (language in contract will be construed against drafter only if contract found to be ambiguous); *GTE Mobilnet of S. Tex. Ltd. Partnership v. Telecell Cellular, Inc.,* 955 S.W.2d 286, 290 (Tex.App.-Houston [1st Dist.] 1997, pet. denied) (same); *see also Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 860 (Tex.2000) (rule construing contract against its drafter applies when contract ambiguous).

*op., Inc. v. Parks,* 1 S.W.3d 96, 101 (Tex. 1999).

We quoted above the relevant portion of section 5 of the severance agreements, which provides that a terminated executive receives in a single lump sum, an amount equal to 2.99 times the sum of (A) Base Pay plus (B) Incentive Pay.

According to Reliant, "Incentive Pay" encompasses only the annual bonus, based on performance for the year under consideration, and does not encompass all awards under a "bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement," such as stock options and restricted stock. According to the plaintiffs, "Incentive Pay" means the annual bonus, as well as the value of any long-term performance measure payments, such as stock options and restricted stock under a "bonus, incentive, profit-sharing, performance, discretionary pay or similar agreement, policy, plan, program or arrangement."

 The severance agreements do not specifically reference the name of the document that determines "the annual amount" pursuant to "any bonus, incentive … plan." In their brief, the plaintiffs state there were "numerous bonus and incentive awards in place." Attached to the summary judgment motions of Creel and Zimmerebner are the following documents: (1) NorAm Energy Corp. 1994 Incentive Equity Plan, (2) Long Term Incentive Plan Cycles VII, VIII and IX Current Performance Data, (3) Restricted Stock Agreement Performance Cycle IX, and (4) Cycle IX Incentive Stock Option Agreement.[8] We have reviewed all of these documents.

According to the plaintiffs' brief and to their motions for summary judgment, Reliant used the "Annual Incentive Award" under the 1994 Incentive Equity Plan for the purpose of determining their "Incentive Pay." The 1994 Plan defined the "Annual Incentive Award" as "the annual incentive compensation payment made pursuant to Paragraph 9." Paragraph 9 provided that the Compensation and Benefits Committee of NorAm's Board of Directors could authorize payment of annual incentive compensation, which became payable upon achievement of specified Management Objectives. The Management Objectives were based on a one-year Performance Cycle. Annual incentive compensation could be paid in cash, shares of common stock equal to the aggregate value of the incentive compensation payable, or a combination of both, as determined by the Committee.

The 1994 Plan also provided that the Committee, from "time to time," could authorize grants to participants of:

(1) "Option Rights," options to purchase shares of common stock.

(2) "Appreciation Rights," a right for a participant to receive an amount determined by the Committee at the date of grant and expressed as a percentage of the spread at the time of exercise. *Appreciation Rights could* be granted in tandem with Option Rights or separate and apart from them.

**8.** The parol evidence rule does not preclude evidence of prior or contemporaneous agreements that are not inconsistent with, and do not vary or contradict, express or implied terms or obligations of a separate written agreement. *Transit Enters., Inc. v. Addicks Tire & Auto Supply, Inc.,* 725 S.W.2d 459, 461 (Tex.App.-Houston [1st Dist.] 1987, no writ).

Evidence of surrounding circumstances may be consulted. *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in construction of the contract's language. *Id.*

(3) "Restricted Stock," grants or sales of restricted common stock to participants.

(4) "Opportunity Shares," grants of opportunity shares.

(5) "Performance Units," grants of performance units.

■ The plaintiffs argue that the value of the long-term components of the 1994 Plan—common stock, opportunity shares, option rights, appreciation rights, restricted stock, and performance units—should also have been included as "Incentive Pay," in determining their severance compensation. However, the only award the 1994 Plan characterized as "annual" was the "Annual Incentive Award." The other components were awarded from "time to time."

Reliant does not specifically refer to the 1994 Plan in its brief. Reliant refers generically to "NorAm's (or NorAm's successor, Reliant Energy's) annual incentive plan." According to the recitals in Reliant's "Annual Incentive Compensation Plan" (AICP), it superseded and replaced the annual incentive awards portion of NorAm's 1994 Plan effective January 1, 1999. Reliant also refers to the "annual bonus" as the annual cash bonus provided under NorAm's annual incentive plan or any replacement plan that performed the same function of providing an annual cash bonus. The AICP does not contain the term "annual bonus," but instead defines "award" as "an incentive compensation award payable in cash granted to a Participant with respect to a particular Plan Year." Under the AICP, the Compensation Committee of the Board of Directors has the sole and absolute authority and discretion to determine the time and manner of the awards, but the AICP states that generally, awards are made in cash and are made at the end of the Plan Year. In its brief, Reliant also discusses Reliant's long term incentive compensation plan, which included grants of stock options and restricted stock and was based on three-year performance cycles. According to Reliant's motion for summary judgment, following the close of the merger, Reliant's long term incentive plan replaced that of NorAm's for the executives, including Jones and Zimmerebner, who stayed on with Reliant.

The plaintiffs contend that the value of the long-term incentive payments should be included in "Incentive Pay" because the long-term incentive payments were, in fact, made annually. They assert Reliant admitted that, regardless of the nature of the underlying performance measure, participants received awards under both short-term and long-term incentive plans on an annual basis. The plaintiffs rely on the deposition testimony of Dean Woods, a former employee of NorAm and, at the time of his deposition, the Executive Director of Compensation and Benefits for Reliant.

Q: Is your position, Mr. Woods, that [Creel] was not receiving annual payments under the LTIP or long-term incentive plan?

A: May I say exactly what I believe he was receiving?

Q: Absolutely.

A: He was receiving, as all participants in that plan were receiving, periodic awards or grants of stock options or performance shares under the terms of the plan.

Q: How often were these periodic awards?

A: Typically, they were annual awards.

However, immediately after that answer, Woods was asked if Creel received a payment under the long-term incentive plan for the year the "Change in Control" occurred, that is 1997, the date the merger

was approved.[9] Recall that "Incentive Pay" meant an annual amount equal to not less than the annual bonus that would have been paid for the year in which the Change in Control occurred.

Woods's discussion in his deposition of the payment Creel received in 1997 under the long term incentive programs indicates that it resulted from the acceleration of the long term incentive programs in accordance with the terms of the severance agreements. Section 3 of the severance agreements provided as follows:

3. *Acceleration of Incentive Benefits.* On the date that the last regulatory approval is obtained for a transaction which, if consummated, would result in a Change in Control, (i) all outstanding stock options to purchase stock of the Company that are then held by the Executive will become immediately exercisable notwithstanding any provision contained in any stock option agreement to the contrary, and (ii) all shares of restricted stock previously issued to the Executive which have not been forfeited by the terms of any restricted stock agreement, together with any opportunity shares provided for in such agreement, will be delivered immediately to the Executive free of all restrictions (other than restrictions on transfer imposed by federal or state securities laws) notwithstanding any provision contained in any restricted stock agreement to the contrary.

It would not be reasonable to treat as an "annual amount" for purposes of "Incentive Pay" under the severance agreement an amount that was paid annually only in the year of the Change of Control based on an acceleration of benefits clause in the same severance agreement.

It appears to this Court that the only reasonable construction to be given to "Incentive Pay" is that it consists of the "Annual Incentive Award," defined as the annual incentive compensation payment under the NorAm 1994 Plan or the "award" defined as "an incentive compensation award payable in cash granted to a Participant with respect to a particular Plan Year" under Reliant's AICP. "Incentive Pay" does not include the value of long term incentive awards such as stock options or restricted stock. Accordingly, we conclude the trial court did not err in granting Reliant's motion for summary judgment against the plaintiffs on their claims of breach of contract arising from the calculation and payment of the plaintiffs' severance compensation.

### Exclusion of Summary Judgment Evidence

In their second issue, the plaintiffs contend that the trial court erred in excluding as summary judgment evidence the employment agreement between Reliant and nonparty Wayne Stinnett executed on March 31, 1999. The Stinnett agreement was attached as an exhibit to Creel's opposition to Reliant's motion for summary judgment. Reliant objected to the Stinnett agreement being used to construe the severance agreements because it was not attached to any deposition testimony as an exhibit nor was it otherwise sworn to as a true and correct copy. In its response to the plaintiffs' motions for summary judgment, Reliant also objected to the use of the Stinnett agreement in interpreting the severance agreements under the parol evidence rule. The trial court excluded the Stinnett agreement.

9. Woods's testimony relates only to Creel. He does not mention, at least in the portion to which we are cited, Jones or Zimmerebner.

■ Even were we to hold that the Stinnett agreement was relevant and that it was not required to be authenticated or self-proving, the application of the parol evidence rule would still support the exclusion of the Stinnett agreement, entered into in 1999, in interpreting the severance agreements (executed in 1996). *See Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981); *Transit Enters., Inc. v. Addicks Tire & Auto Supply, Inc.*, 725 S.W.2d 459, 461 (Tex.App.-Houston [1st Dist.] 1987, no writ). Accordingly, we conclude the trial court did not err in excluding the Stinnett agreement.

### Summary Judgment on Creel's Tort Claims

In a separate brief, Creel contends that the trial court erred in granting Reliant's motion for summary judgment on his negligence claim and tortious interference claim because Reliant neither negated an essential element of Creel's claims nor conclusively established an affirmative defense to Creel's claims. Furthermore, Creel asserts that his tort claims are not "repackaged contract claims," *see Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493 (Tex.1991), as argued by Reliant. In connection with this assertion, Creel maintains that his tort claims were not based on any alleged violation of the severance agreement, but rather on Reliant's wrongful conduct with respect to Creel's relationship with Trust Agreement No. 2.

■ It is well established in Texas that a plaintiff cannot take a breach of contract claim and convert it into a tort claim. *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 44–45 (Tex.1998); *DeLanney*, 809 S.W.2d at 494. To distinguish contract and tort causes of action, we analyze the source of the duty and the nature of the

remedy. *Formosa Plastics Corp.*, 960 S.W.2d at 45.

■ Trust Agreement No. 2 is an agreement between Reliant (as a successor in interest grantor) and the trustee. Under the express wording of Trust Agreement No. 2, the beneficiaries of the trust created by the agreement are entitled to enforce all the terms and provisions of the agreement, although they are not parties to the agreement We have carefully reviewed Trust Agreement No. 2 and conclude that Reliant as grantor took no actions under that agreement relative to Creel that it was not entitled to take. While Creel asserts that his claims are not based on any violations by Reliant of the severance agreement, in fact, they are. It is through the severance agreement that Creel is entitled to have his legal fees and expenses paid for by Reliant and to be a beneficiary of the trust created by Trust Agreement No. 2.

Reliant's duty to pay for Creel's legal fees and expenses rests on section 8 of the severance agreement. Based on the wording of the severance agreement, we conclude that Reliant's duty to pay Creel's attorneys' fees in connection with enforcement or interpretation of that agreement is based on the agreement itself, that Creel's remedy rests in contract, and that the parties contractually contemplated, in executing the agreement, the dispute which is the subject of this litigation.

Based on *Formosa Plastics Corp.* and *DeLanney*, the trial court did not err in rendering summary judgment for Reliant on Creel's tort claims. We overrule Creel's issue.

### Summary Judgment on the Attorneys' Fees and Related Expenses Issue

In its appellant's brief, Reliant presents the issue that the trial court erred in concluding that section 8 of the severance

agreements unambiguously obligated Reliant to pay the plaintiffs' attorneys' fees and related expenses.

Reliant argues that, based on the plain, unambiguous language of section 8 of the severance agreements, its obligation to pay attorneys' fees must be determined with reference to the "benefits intended to be extended" or the "benefits provided or intended to be provided to the Executive." According to Reliant, because the trial court concluded that Reliant correctly determined the amount of severance compensation, there was no intent to provide the benefit of the additional "Incentive Pay" sought by the plaintiffs in this litigation. Reliant also contends that this Court should consider the circumstances surrounding the formation of the severance agreements, as shown in the testimony of Rick Spurlock, which it claims confirms that the purpose of the attorneys' fees provision was not to subsidize frivolous or unmeritorious claims. Alternatively, Reliant argues that section 8 of the severance agreements is ambiguous and that summary judgment on the attorneys' fees matter was, therefore, improper.

Reliant's main argument rests on two small phrases and ignores the remainder of section 8, such as: "It is the intent of the Company that the Executive not be required to incur legal fees and the related expenses associated with the interpretation, enforcement or defense of Executive's rights under this Agreement by litigation or otherwise ....", and: "Without respect to whether the Executive prevails, in whole or in part,[10] in connection with any of the foregoing, the Company will pay and be solely financially responsible for any and all attorneys' and related fees and expenses incurred by the Executive in connection with any of the foregoing."

The phrase, "benefits intended to be extended" does not qualify the Company's responsibility to pay the Executive's attorneys' and other related fees and expenses incurred in connection with litigation interpreting the severance agreements, such as this litigation. The phrase is contained only in the reason given for the Company's undertaking such a responsibility without qualification: "because the cost and expense therefore would substantially detract from the benefits intended to be extended to the Executive hereunder." The second phrase, or the "benefits provided or intended to be provided to the Executive," appears in a part of section 8(a) that does not apply to this litigation, which was instituted by the plaintiffs: "in the event that the Company or any other person takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, the Executive the benefits provided or intended to be provided to the Executive hereunder...."

Finally, the language of section 8(a) gave the plaintiffs discretion to commence this litigation and seek payment of their attorneys' fees from Reliant without limit or qualification: "Accordingly, if it should appear to the Executive that the Company has failed to comply with any of its obligations under this Agreement...." Accordingly, we conclude that the trial court

---

**10.** We are unconvinced by Reliant's assertion that by not stating, "whether or not," or "prevails, in whole or in part or not at all," section 8 addresses only the situation in which the plaintiffs prevail and is silent concerning those situations where the plaintiffs lose. We have consulted two dictionaries, both of which indicate that "whether" may be used to introduce two alternatives, the second of which may be implied or understood. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1425 (11th ed.2003); WEBSTER'S UNABRIDGED DICTIONARY 2165 (2d ed.1997).

did not err in granting the plaintiffs' motion for partial summary judgment on the issue of attorneys' fees.

## Conclusion

The judgment is affirmed.