TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-04-00700-CV






Joyce Ludwig, Appellant


v.


Encore Medical, L.P. f/k/a Encore Orthopedics, Inc.; Encore Medical GP, Inc.;

and Encore Medical Corporation, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. GN201588, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING





O P I N I O N



 Appellee Encore Medical L.P. (1) adopted a severance agreement to protect its key
executives should a third party take control of the company. Two conditions triggered benefits under
the agreement: a change of control and a termination event, defined to include an executive's
resigning for "good reason." Joyce Ludwig sued for severance benefits, alleging that control of the
company had changed and that she had terminated her own employment for good reason. Encore
denied both allegations. The jury found that control of the company had changed but that Ludwig
had not terminated her employment for good reason. Consequently, no benefits were provided to
Ludwig by the severance agreement. After the jury's verdict, Ludwig presented her claim for
attorney's fees to the court, asserting that under the severance agreement, Encore was obligated to
pay litigation expenses even to a non-prevailing party. The district court denied her request for
attorney's fees and entered a take-nothing judgment on the jury verdict. Ludwig does not appeal the
take-nothing judgment but complains only of the court's failure to grant her attorney's fees. We hold
that the district court did not err in denying attorney's fees to Ludwig under these circumstances. 

BACKGROUND

 Encore designs, manufactures, and markets orthopedic devices for medical purposes. 
Encore was formed in 1992 by seven individuals who all had prior experience with orthopedic
implants. Joyce Ludwig and her husband Ken were two of Encore's founding employees. Ken was
vice president of sales and marketing, Joyce managed quality assurance.

 In 1995, president Nicolas Cindrich decided to reward Encore's founding employees
with severance agreements. Ludwig received a severance agreement because she was one of the
original employees. Cindrich testified that the purpose of these agreements was to protect the
founders "in the event that we [Encore] were acquired and the people that bought the company
wanted to either replace or displace" an executive. Harry Zimmerman, Encore's general counsel,
drafted the agreements; he testified that the severance agreements were designed "to protect the
employees in case the company was sold, somebody came in and bought the company, took it over,
and then either fired them or tried to run them away." The severance agreement imposed mutual
covenants of non-competition, confidentiality and non-disparagement on the protected executives. 

 In 1997, Encore became a public company; its stock was traded on the NASDAQ
exchange. In 2000, a group known as Galen Entities made a substantial capital investment in Encore
in exchange for Series A Preferred Stock. Amon Burton, a professor at the University of Texas
School of Law, testified that in his expert opinion "a change of control had occurred at Encore when
they closed the transaction to sell those shares to the Galen Entities." Professor Burton's opinion
was based on his analysis of the rights Galen Entities received as owners of the preferred shares. 
One condition of Galen Entities' investment was that all key executives, except Joyce Ludwig,
surrender their severance agreements. (2) 

 In January 2001, Encore terminated Ludwig's husband, Ken. After failing to find a
job locally, Ken began a nationwide search. In November 2001, he accepted a job in Bethlehem,
Pennsylvania and moved there the following month. On December 1, 2001, Joyce Ludwig informed
her supervisor, J.D. Webb, that she was resigning to follow her husband to Pennsylvania. She asked
if she could continue working until her house sold; this arrangement seemed mutually beneficial and
was agreed to by Encore. Ludwig testified that she gave Webb notice of her relocation out of
professional courtesy. She also indicated that she was willing to assist Webb in finding and training
her replacement. Webb informed his supervisor, Craig Smith, and Encore's human resources
department of Ludwig's announced departure. Webb began advertising for Ludwig's replacement
in January 2002 and Ludwig helped interview the applicants.

 Three months later, after consulting with a local employment attorney, Ludwig
delivered a letter to Webb on March 1, 2002, stating that as a "single mom" she was terminating her
employment "effective immediately" because of increased travel requirements:


I have decided to terminate my employment with Encore for 'Good Reason' as that
term is defined in my Severance Agreement. Specifically, despite my repeated
objections, the Company has significantly increased the travel requirements of my
position by requiring that I spend more than twice the number of nights away from
home during the present 6 month period (9/2001 through 2/2002) than were
necessary during the previous six month period, or any six month period since I
began working at Encore in 1992. Accordingly, I have experienced a 'Termination
Event' under Section 2(a) of my Severance Agreement and am therefore entitled to
the severance benefits set forth in Section 2(b) of the Severance Agreement. I expect
the Company to honor its obligations under the Severance Agreement.


Harry Zimmerman responded the same day that Encore believed that it was not obligated to honor
her severance agreement demands because she had previously tendered her resignation for personal
reasons on December 1, 2001. Ludwig responded that she did not "actually" resign in December
2001 but merely informed Webb that she "would eventually resign to join my husband in
Pennsylvania." She also asserted that her March 2002 resignation, which occurred prior to the sale
of her house, was "premature and directly attributable to the strain of the increase in travel that has
been required over the past 6 months." Ultimately, Encore determined that Ludwig was not entitled
to benefits provided by the severance agreement because she had previously terminated her
employment for personal reasons rather than for "good reason" under the agreement.

 In May 2002, Ludwig sued Encore. Ludwig claimed that Encore had breached her
severance agreement. She also insisted that her severance agreement required Encore to pay all of
her legal fees, whether or not she prevailed. Ludwig authorized her attorneys to bill Encore for any
fees or expenses incurred as a result of her litigation. In addition, Ludwig filed an application for
a temporary injunction asking the district court to enjoin Encore from continuing to refuse to pay her
ongoing litigation expenses. Encore maintained that it was not obligated to pay Ludwig's litigation
expenses because she was not entitled to any benefits or rights provided by the severance agreement. 
The district court denied Ludwig's application for interim attorney's fees.

 Ludwig's suit was tried in March 2005. The parties agreed that the severance
agreement did not provide any benefits unless (1) there was a change in control of Encore, and (2)
a "termination event" occurred. The only termination event claimed was that Ludwig terminated her
employment with Encore for "good reason," as that term is defined in the agreement. (3) Encore
insisted that neither condition had occurred. Encore admitted that a significant increase in Ludwig's
travel requirements could constitute good reason for leaving, but disputed that increased travel was
the actual reason for Ludwig's resignation, which had already been tendered December 1 for
personal reasons. Encore insisted that Ludwig's real reason for leaving the company was her desire
to move to Pennsylvania to be with her husband, as she stated to her supervisor three months before
she decided to claim benefits under the severance agreement on March 1, 2002. Encore noted that
Ludwig did not complain about the travel requirements until January and February 2002; however,
when she did complain the trips were either canceled or postponed. (4) Ultimately, the jury found that
Encore did undergo a change in control but that Ludwig did not terminate her employment for good
reason. 

 After the jury was excused, the district court held a hearing on Ludwig's motion for
an instructed verdict on attorney's fees and litigation expenses. Both parties stipulated that this issue
would be tried to the court and that the court could consider all evidence presented during the trial
to the jury. Ludwig insisted that Encore was contractually obligated to pay her litigation expenses,
even though she did not prevail. Encore contended that Ludwig was not entitled to any benefits
provided by the severance agreement, including litigation expenses, because she had previously
resigned for personal reasons. The district court denied attorney's fees and rendered a take-nothing
judgment based on the jury's verdict. 

 Ludwig requested findings of fact and conclusions of law pertaining to the denial of
attorney's fees. The district court issued one finding of fact that Ludwig "did not seek to obtain or
enforce any right or benefit provided by the Severance Agreement." The district court issued four
conclusions of law in support of its denial of attorney's fees: (1) Ludwig was not entitled to any
attorney's fees or expenses incurred in the prosecution of her claims against Encore; (2) Ludwig was
not entitled to have the court make a finding on the reasonableness and necessity of her attorney's
fees; (3) the litigation expenses provision is ambiguous; and (4) to the extent that it could be
construed to allow for payment of Ludwig's attorney's fees if she lost at trial, the litigation expenses
provision is void as against public policy. In this appeal, Ludwig does not complain of the jury's
failure to find that she terminated her employment for good reason. Her sole complaint is that she
was entitled to litigation expenses under the severance agreement as the non-prevailing party and that
this construction of the agreement is not against public policy.


DISCUSSION

 Ludwig claims that the district court erred in refusing to award attorney's fees and
expenses because (1) she did not have to prevail on the merits of her claims to recover reasonable
attorney's fees and expenses, (2) the evidence in the record conclusively demonstrates that she did
seek to obtain or enforce a right or benefit provided by her severance agreement, and (3) the
contractual fee-shifting provision at issue in this case does not violate public policy as the district
court concluded. Ludwig insists that her third point makes this a case of first impression: whether
parties may contractually decide to provide attorney's fees to a non-prevailing party. We need not
reach the public policy question, because construing the litigation expenses provision in light of the
whole severance agreement, we hold it does not obligate Encore to pay Ludwig attorney's fees under
the circumstances of this dispute.


Severance agreement

 When construing a written contract, our first priority is to determine the intent of the
parties as expressed in the instrument. J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex.
2003); National Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995); EMC
Mortg. Corp. v. Davis, 167 S.W.3d 406, 413 (Tex. App.--Austin 2005, pet. filed). We consider the
entire writing and attempt to harmonize and give effect to all the provisions of the contract by
analyzing the provisions with reference to the whole agreement. Frost Nat'l Bank v. L&F Distribs.,
165 S.W.3d 310, 311-12 (Tex. 2005); Webster, 128 S.W.3d at 229. If the contract is so worded that
it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the
court will construe it as a matter of law. Frost Nat'l Bank, 165 S.W.3d at 312; Coker v. Coker, 650
S.W.2d 391, 393 (Tex. 1983); EMC Mortg., 167 S.W.3d at 313. Whether a contract is ambiguous
is a question of law for the court to decide by looking at the contract as a whole in light of the
circumstances present when the contract was entered. Coker, 650 S.W.2d at 394; Wagner v.
Compass Bank, 170 S.W.3d 220, 222 (Tex. App.--Dallas 2005, no pet.); EMC Mortg., 167 S.W.3d
at 313.

 An ambiguity in a contract may be "patent" or "latent." See Friendswood Dev. Co.
v. McDade + Co., 926 S.W.2d 280, 282 (Tex. 1996); Centerpoint Energy Houston Elec., L.L.P. v.
Old TJC Co., 177 S.W.3d 425, 431 (Tex. App.--Houston [1st Dist.] 2005, pet. denied). A patent
ambiguity is evident on the face of the contract. Friendswood Dev. Co., 926 S.W.2d at 282;
Centerpoint Energy, 177 S.W.3d at 431. A latent ambiguity arises when a contract that is
unambiguous on its face is applied to the relevant subject matter and an ambiguity appears by reason
of some collateral matter. Friendswood Dev. Co., 926 S.W.2d at 282-83; Centerpoint Energy, 177
S.W.3d at 431. If a latent ambiguity arises from this application, parol evidence is admissible for
the purpose of ascertaining the true intention of the parties as expressed in the agreement. CBI
Indus., Inc., 907 S.W.2d at 520; Centerpoint Energy, 177 S.W.3d at 431. When a latent ambiguity
arises, the focus shifts to the facts and circumstances under which the agreement was made. 
Centerpoint Energy, 177 S.W.3d at 431. A latent ambiguity exists when the contract appears to
convey a sensible meaning on its face, but it cannot be carried out without further clarification. See
CBI Indus., 907 S.W.2d at 520.

 The litigation expenses provision in section five of the severance agreement states:



The Company shall pay reasonable legal fees and expenses incurred by the Executive
as a result of her seeking to obtain or enforce any right or benefit provided by this
Agreement, promptly and from time to time, at her request as such fees and expenses
are incurred.


This provision does not specifically restrict the right to receive fees and expenses to a prevailing
party. Nor does not it explicitly obligate the company to pay fees to a non-prevailing party. In fact,
it is silent as to whether a party must prevail to claim litigation expenses. Ludwig insists that the
provision implicitly covers a non-prevailing party because it obligates the company to pay fees
incurred while "seeking to obtain or enforce" a right or benefit provided by the severance agreement. 
She also notes that fees must be paid "from time to time, at her request as such fees and expenses
are incurred," presumably before the prevailing party has been determined. We agree that these
words plainly and unambiguously authorize interim attorney's fees if the executive is seeking to
obtain any right or benefit provided by the agreement. We further agree that seeking a right or
benefit is different than actually enforcing or obtaining the benefit. Therefore, we conclude that the
litigation expenses provision is unambiguous on its face; an executive seeking to obtain or enforce
a right or benefit provided by the agreement is entitled to attorney's fees under the provision whether
or not they prevail at trial. 

 However, the provision is silent as to whether an executive is entitled to attorney's
fees when she sues to obtain a benefit under circumstances in which the agreement clearly provides
no benefits. Here, Ludwig maintains that the litigation expenses provision obligates Encore to pay
her attorney's fees any time she seeks benefits, whether or not that circumstance was contemplated
by the agreement. The agreement protects against termination for a period of three years. Could an
executive terminated for good reason three years and one week after a change of control sue for
benefits and claim that she is entitled to her litigation expenses under the literal reading of the
litigation expenses provision? Does the agreement require the court to award litigation expenses for
such a suit? Even Ludwig agrees that it does not. Such a claim comes too late and is not
contemplated by the agreement: no benefits are "provided" for such a claim. (5) Could the district court
similarly determine that this severance agreement provides no benefits to an employee who has
previously resigned for personal reasons? Would it be too late to assert a claim under this
agreement? We hold that the district court could conclude that the plain language "seeking to obtain
or enforce any right or benefit" has some limits and therefore did not err in holding the litigation
expenses provision latently ambiguous under these narrow circumstances or by considering parol
evidence. Friendswood Dev. Co., 926 S.W.2d at 282-83; CBI Indus., 907 S.W.2d at 520;
Centerpoint Energy, 177 S.W.3d at 431. 

 The severance agreement was designed to benefit both Encore and the executive. It
plainly provides "the Company wishes to be assured that it will have the continued dedication of the
Executive and the availability of her advice and counsel despite the possibility, threat or occurrence
of a bid to take over control of the Company." Additionally, "the Company wishes to induce the
Executive to remain in the employment of the Company under such circumstances." It further states
that in the event of a possible change in control, "[T]he Company should be able to rely upon the
Executive to continue in her position . . . without concern that the Executive might be distracted by
any personal uncertainties and risks created by such a proposal." To achieve these goals the
agreement sets forth mutual promises and covenants. Encore promised to pay severance benefits to
the executive if there was a change in control and a termination event occurred. If the company is
obligated to pay severance benefits to an executive, she must comply with several covenants
beneficial to Encore. (6) 

 The plain language of the agreement makes it clear that there are no rights and
benefits provided under the severance agreement unless a "termination event" occurs. The only
termination event alleged was that Ludwig resigned for good reason. Encore defended this suit by
maintaining that Ludwig had already resigned for personal reasons before she attempted to resign
for good reason. If Ludwig had already resigned, she was not entitled to any benefits under the
severance agreement. The jury agreed, finding that she did not resign for good reason. This
construction does not ignore the word "seeking" or the words "from time to time." An executive
may have to sue to enforce her benefits due to a dispute pertaining to the amount or timely payment
of benefits, or due to an allegation that she breached her covenants of non-competition or non-disparagement. Under such circumstances the litigation expenses provision as written would apply,
whether or not the executive ultimately prevailed. 

 Ludwig relies on Creel v. Houston Industries, Inc., 124 S.W.3d 742 (Tex.
App.--Houston [1st Dist.] 2003, no pet.), to support her claim for attorney's fees. In Creel, three
executives with severance agreements providing for payment of litigation expenses sued their former
employer, challenging the employer's method of calculating their benefits. The attorney's fees
provision at issue in Creel stated


It is the intent of the Company that the Executive not be required to incur legal fees
and the related expenses associated with the interpretation, enforcement or defense
of Executive's rights under this Agreement by litigation or otherwise. . . . [T]he
Company irrevocably authorizes the Executive from time to time to retain counsel
of Executive's choice, at the expense of the Company . . . to advise and represent the
Executive in connection with any such interpretation, enforcement or defense,
including without limitation the initiation or defense of any litigation. . . . Without
respect to whether the Executive prevails, in whole or in part, in connection with any
of the foregoing , the Company will pay and be solely financially responsible for any
and all attorneys' and related fees and expenses. 


Creel, 124 S.W.3d at 745-46. Ultimately, the trial court affirmed the employer's method of
calculating severance benefits under the contract, but awarded attorney's fees to the non-prevailing
plaintiffs. Id. at 748. On appeal, the employer argued that the purpose of the attorney's fees
provision was not to subsidize frivolous or unmeritorious claims and that any obligation to pay
attorney's fees must be determined with reference to the benefits provided or intended to be provided
under the agreement and that no attorney's fees were due to the non-prevailing executives. Id. at
754. Our sister court disagreed, holding that the attorney's fees provision's explicitly "gave the
plaintiffs discretion to commence this litigation and seek payment of their attorneys' fees . . . without
limit or qualification." Id. The Creel agreement permitted the executive to retain counsel in
connection with any interpretation, enforcement or defense, including without limitation the
initiation or defense of any litigation. Id. at 745-46. The company was explicitly required to pay
counsel of the executive's choice "without respect to whether the Executive prevails, in whole or in
part," for "any and all attorneys' and related fees and expenses." Id. In Creel, the company's
obligation was not even limited to "reasonable" attorney's fees; arguably this expansive provision
was intended to cover the expense of any counsel the executive chose to advise or represent her. Id. 
The company's unlimited obligation is expressed in its intent that the executive incur no legal
expense for "litigation or otherwise." Id. at 745. 

 By contrast, Encore's obligation to Ludwig under this litigation expenses provision
is more ambiguous. It does not specifically provide litigation expenses to the non-prevailing party. 
Nor does it grant the executive such wide-ranging choice of when to employ counsel; she must be
seeking benefits actually provided by the agreement. This provision does not express the company's
intent to relieve the executive of "any and all" legal fees. Moreover, the Creel executives would
have been entitled to attorney's fees even under the district court's construction of the Encore
agreement: the Creel executives were undeniably entitled to benefits provided by their agreements
and only disputed the calculation of those benefits.

 We reject Ludwig's reading that under this latently ambiguous provision Encore must
reimburse legal expenses to every executive who seeks benefits under the severance agreement, even
under circumstances where the agreement provides no benefits. Nicolas Cindrich, Encore's
president at the time the severance agreement was drafted, testified that the agreement was not
designed to be a bonus or to protect an employee who left the company for personal reasons. 
Likewise, Harry Zimmerman, Encore's corporate counsel who drafted the agreement, testified that
an executive would not be entitled to attorney's fees under the litigation expenses provision unless
the severance agreement had been triggered. We hold that an executive who has previously resigned
for personal reasons is unable to seek to obtain benefits provided by this severance agreement, just
as an executive seeking severance benefits for a termination event that occurred three years and one
week after a change of control could not seek benefits under the agreement. 

 It was not unreasonable to construe the litigation expenses provision to deny
attorney's fees sought by an executive who had already resigned for personal reasons before claiming
severance benefits for a termination event. Accordingly, the district court did not abuse its discretion
in construing the agreement to deny attorney's fees under the circumstances of this dispute. 


Legal and factual sufficiency

 In its only finding of fact concerning the denial of attorney's fees, the district court
found: "Plaintiff did not seek to obtain or enforce any right or benefit provided by the Severance
Agreement." Ludwig contends that the evidence is legally and factually insufficient to support this
finding and contends that evidence in the record conclusively establishes the opposite. If legally and
factually sufficient evidence supports the jury's finding that Ludwig did not terminate her
employment for good reason and Encore's contrary contention that Ludwig had already terminated
her employment for personal reasons, the district court's finding that Ludwig did not seek benefits
provided by the agreement would be supported by legally and factually sufficient evidence.

 Findings of fact in a bench trial have the same force and dignity as a jury verdict and
are reviewable for legal and factual sufficiency of the evidence by the same standards as applied in
reviewing a jury's findings. See Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina v.
Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); Anderson v. City of Seven Points, 806 S.W.2d 791, 794
(Tex. 1991). When considering a factual sufficiency challenge, the reviewing court must consider
and weigh all of the evidence, not just the evidence that supports the verdict. Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998); Nip v. Checkpoint Sys., Inc., 154 S.W.3d 767,
768-69 (Tex. App.--Houston [14th Dist.] 2004, no pet.). The reviewing court may set aside the
verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly
wrong and unjust. Maritime Overseas Corp., 971 S.W.2d at 407. The reviewing court does not
serve as a fact-finder and may not pass upon the witnesses' credibility or substitute its judgment for
that of the fact-finder, even if the evidence would clearly support a different result. Id. In a legal
sufficiency review, "appellate courts must view the evidence in the light favorable to the verdict,
crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless
reasonable jurors could not." City of Keller v. Wilson, 168 S.W.3d 802, 807 (Tex. 2005). The test
for legal sufficiency is whether the evidence at trial "would enable reasonable and fair-minded
people to reach the verdict under review." Id. at 827.

 Encore argued at trial that Ludwig did not terminate her employment for a good
reason because she had voluntarily resigned for personal reasons. On December 1, 2001, she
informed her supervisor, J.D. Webb, that she would be leaving the company and moving to
Pennsylvania to be with her husband. Ludwig responded that she did not "actually resign" in
December, she merely notified Encore that she would be resigning soon. Rather, she argued that her
resignation took place in March because of the strain of the increase in required travel. 

 Webb testified that he believed that Ludwig was tendering her resignation in
December 2001. He considered her resignation to be official then and began the process of replacing
her. Webb told then president Craig Smith and Kathy Weiderker, Encore's vice president of human
resources, that Ludwig was resigning. Webb added that he periodically began to check in with
Ludwig regarding the status of the sale of her house so that he would know when to bring in her
replacement. On cross-examination, Webb stated that he began advertising for Ludwig's
replacement in January 2002 and that he, with Ludwig's assistance, began interviewing applicants
soon after. Finally, Webb explained that he reacted with "total surprise" to Ludwig's March 2002
resignation letter because she had already resigned; he had posted the position, and he and Ludwig
had interviewed applicants well before March 1. He also explained that after she announced her
resignation in December, the company agreed to accommodate Ludwig's request to stay on until her
house sold.

 Ludwig testified that her only resignation from Encore occurred on March 1, 2002. 
She explained that her decision to resign was in direct response to increased travel requirements,
which had significantly impaired her ability to care for her daughter since her husband had moved
out of state. On cross-examination she conceded that she did not openly object to the increase in
travel until February 2002, and that no one ever told her that she was required to go on any of the
trips. She also admitted that the two times when she did complain, the trip was postponed. On
cross, she had this response to questioning about her reasons for leaving Encore:


Q: It's correct, is it not, that your husband, Ken, accepted a job in Pennsylvania in
November of 2001.


A: That's correct.


Q: And at that point in time, you knew that you were quitting your job at Encore
Orthopedics and moving to Pennsylvania.


A: Eventually, yes.


Q: And it's also correct, is it not, that the ultimate reason that you quit was because
your husband got a job out of state.


A: Ultimately, yes.

* * * 


Q: Now, you told Mr. Webb, did you not, that you had already made a decision that
you were leaving as soon as your house in Cedar Park was sold, right?


A: In December, yes.


Q: It didn't matter what your travel requirements were, you were already decided
to move.


A: That is correct.


Q: It didn't matter what your job responsibilities were, you had already decided to
move.


A: We had decided to move, yes.


Ludwig also confirmed that she told the applicants she interviewed to replace her that she was
leaving the company to move out of state, not because of an increase in travel. In addition, she
acknowledged that, starting in December 2001, she began to tell people in the office that she was
leaving the company because her husband took a job out of state. She admitted that she told this to
Craig Smith and Harry Zimmerman. Encore's consistent defense to Ludwig's claims was that she
had already resigned for personal reasons.

 Ultimately, the jury was asked to determine whether Ludwig terminated her
employment for good reason, as that term was defined by the severance agreement. The jury
answered "no." The jury was in the best position to judge the credibility of Ludwig and the Encore
witnesses to determine when and why she resigned. After reviewing the record, we conclude that
the evidence presented at trial would enable reasonable and fair-minded people to reach a similar
determination. City of Keller, 169 S.W.3d at 827. Nor is the jury's determination so contrary to the
overwhelming weight of the evidence that it is clearly wrong and unjust. Maritime Overseas Corp.,
971 S.W.2d at 407. Therefore, the record contains legally and factually sufficient evidence
supporting the jury's finding that Ludwig did not terminate her employment for good reason because
she had already resigned for personal reasons.

 At the post-trial hearing on Ludwig's motion for attorney's fees, the parties agreed
that the district court could and should consider all of the evidence presented throughout the trial. 
This included Encore's evidence that Ludwig had already resigned for personal reasons before she
sought benefits under the severance agreement. We have already determined that there is a latent
ambiguity as to whether litigation expenses must be paid for any claim made under the agreement,
and that in some narrow circumstances fees may be denied for suits not contemplated by the
agreement. The evidence that Ludwig had already resigned for personal reasons supports the district
court's single finding that Ludwig "did not seek to obtain or enforce any right or benefit under the
Severance Agreement." 

 This finding supports the district court's first conclusion of law: "Plaintiff is not
entitled to any attorney's fees and expenses incurred in the prosecution of her claims against
Defendants in this suit." If Ludwig had already resigned for personal reasons, the severance
agreement provided no more benefits than if she had resigned more than three years after the change
in control. Under such a circumstance, the district court's conclusion of law is correct and is
supported by its finding of fact. McIntyre v. Comm'n for Lawyer Discipline, 169 S.W.3d 803, 806-07 (Tex. App.--Dallas 2005, no pet.). 

 Having upheld the district court's denial of attorney's fees on these grounds, we need
not address its alternative conclusion that if the litigation expenses provision could be construed to
award attorney's fees to a non-prevailing party, it is void as against public policy. 


CONCLUSION

 We uphold the district court's denial of litigation expenses on the narrow
circumstances of this dispute and affirm the judgment in all respects. 



 __________________________________________

 Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed: March 9, 2006
1. It appears from the record that appellee Encore Medical L.P. was formerly known as
Encore Orthopedics, Inc., Encore Medical GP, and Encore Medical Corporation. For ease of
reference we will refer to appellee as "Encore."
2. The key executives received stock in exchange for their rights under the severance
agreements. The record does not explain why Joyce Ludwig did not receive stock to surrender her
agreement, but does reflect that she was a mid-level manager and not a key executive. 
3. Section 1(e) of Ludwig's severance agreement provides five instances that would qualify
as a "good reason." Section 1(e)(iv), the only situation relevant to this appeal, states


[A]ny significant increase in the travel requirements of the Executive's position;
for the purposes of this clause (iv) a 'significant' increase would include any
circumstances under which the Executive is or will be required, during any six-month period to spend more than twice the number of nights away from home as
were necessary during the previous six-month period. 
4. Encore disputed that Ludwig's travel was "required." Our review of the record indicates
that during the six-month period from September 1, 2001 to February 28, 2002, Ludwig spent a total
of four nights away from home. Ludwig was not required to spend one night away from home
during the previous six-month period.
5. At oral argument, Ludwig conceded that Encore would not be required to pay litigation
expenses for such a claim; likewise, her brief acknowledges that the severance agreement may not
obligate Encore to pay attorney's fees for a clearly unmeritorious claim.
6. Under the agreement, an executive who is entitled to severance benefits must also agree
to (1) not voluntarily leave the company within three months after a change in control; (2) not
compete with the company; (3) refrain from make any disparaging comments about the company or
any of its affiliates; and (4) refrain from writing or publishing any books, articles, or other materials
that would adversely affect the interests of the company.