# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

444444444444444
NO. 03-03-00306-CV
444444444444444

**National Plan Administrators, Inc. and CRS Marketing Agency, Inc., Appellants**

**v.**

**National Health Insurance Company, Appellee**

44444444444444444444444444444444444444444444444444444444444444
FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. GN101679, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING
44444444444444444444444444444444444444444444444444444444444444

## O P I N I O N

In this case, we must consider the nature of the relationships among an underwriter, a marketing agency, and a third-party administrator in the insurance industry. The trial court determined that the third-party administrator owed the underwriter a fiduciary duty, and a jury assessed damages. In addition, the jury determined that the marketing agent and the third-party administrator operated as a single-business enterprise and so the court assessed all damages, including exemplary damages based on a finding of malice, jointly and severally against the administrator and the marketing agent. For the reasons stated below, we affirm the judgment of the trial court.

## BACKGROUND

Appellee National Health Insurance Company ("National Health") is a health and accident insurance underwriter, issuing individual policies primarily to self-insured individuals, small groups, and families. It contracted with agents, called "captured agents," who are obligated by contract to sell only National Health policies. Appellant CRS Marketing Agency ("CRS") is an insurance agency that focuses on marketing supplemental insurance products purchased through payroll deductions from public sector employees and is owned entirely by Clyde Sommerlatte. It earns commissions on policies sold, which generally include a large commission for the first year or two of the policy with decreasing commissions on subsequent renewals.

In the 1970s, insurance companies began contracting with other business entities, called "third-party administrators," to perform administrative functions for their insurance policies, such as managing sales of policies, providing administration services for policyholders, servicing claims, providing accounting and other administrative functions for group and individual insurance policies, collecting premiums, and collecting and storing information about insured parties. This arrangement allowed insurance underwriters to focus on risk allocation while outsourcing their marketing and administrative functions. In 1987, Texas began to regulate third-party administrators, and the legislature passed the current regulatory statute in 1989. *See* Tex. Ins. Code Ann. art. 21.07-6 (West Supp. 2004); *see also* Act of July 20, 1987, 70th Leg., 2nd C.S., ch. 76, § 1, 1987, Tex. Gen. Laws 238, 238-49. Third-party administrators charge fees for their services as the source of their profits. Appellant National Plan Administrators is a third-party administrator and is owned entirely by CRS. National Plan Administrators provides its services to CRS and to other insurance carriers as well.

Another major change in the insurance industry occurred in the mid-1980s when Congress authorized employers to establish "cafeteria plans." *See* 26 U.S.C.A. § 125 (West Supp. 2004). Under a cafeteria plan, an employee may request an employer to reduce an employee's wages by a certain amount in exchange for the employer purchasing insurance on behalf of the employee or for reimbursing the employee for medical or child-care expenses. *See id.* § 125(d). These deductions are made before taxes are deducted from the employee's pay. *See id.* § 125(a). The employer also receives a benefit by being allowed to deduct these expenditures from its federal taxes as business expenses. *See id.* § 3121(a)(5)(G). Selling an insurance product through a cafeteria plan requires the employer who sponsors the plan to agree to include a particular insurance product in the plan. During the 1980s and 1990s, CRS developed a series of supplemental health insurance products, described as "Cancer and Dread Disease Policies," that were underwritten by American Heritage Life Insurance Company ("American Heritage"). It sold some of these policies to individual employees through cafeteria plans.

Before 1995, CRS decided to move some of its "book of business"[1] from American Heritage to another carrier. Thus, Sommerlatte entered into negotiations with National Health concerning CRS insurance products. According to his proposal, National Health would provide underwriting of the policies while National Plan Administrators would perform all administrative functions pertaining to licensing, commissions, policy underwriting, claims, customer service, and

---

[1] "Book of business" is a term used in the insurance industry to refer to a group of policies that are linked by a particular agent, company, or type of policy. *See New York Life Ins. Co. v. Miller*, 114 S.W.3d 114, 117 (Tex. App.—Austin 2003, no pet.). Some insureds in a book of business will submit claims but others will not. Risk is shared over the book of business so that there is enough income from premiums on the policies as a whole to cover claims as they arise from any individual policy.

3

other functions. National Plan Administrators would also conduct the marketing of the products, using its pre-existing relationships with employers to introduce these new products. Thus, it would act as an extension of National Health, performing many of the duties and responsibilities that National Health, as an insurer, would normally retain for itself.[2] Within its role, it would also hold proprietary information that belonged to National Health.

According to G. Scott Smith, former president of National Health, discussions concerning this relationship focused on creating a "request for proposal" process for generating business. In a request for proposal, a marketing entity, such as CRS, would approach an employer and obtain approval to add the company's name to the list of authorized providers under the cafeteria plan. Then, during the enrollment period for the plan, it would submit a proposal and take applications from individual employees who decided to apply for the insurance product.

National Plan Administrators submitted a proposed contract to National Health in April 1995, and National Plan Administrators and National Health signed two documents that year—an "Administrative, Compensation and Claim Service Agreement" and a "Sharing Agreement."[3] In those documents, National Plan Administrators created a profit-sharing arrangement with National Health. National Health would underwrite catastrophic illness (Cancer and Dread Disease policies) and National Plan Administrators would administer the policies and service the claims according to policy standards and procedures provided by National Health.

[2] CRS was not mentioned in this proposal. Other letters sent from Sommerlatte to National Health at that time bore the CRS letterhead and spoke in particular about CRS's role as marketing agent.

[3] Smith signed the writings on behalf of National Health. Sommerlatte signed them for National Plan Administrators. CRS is not named as a party in either writing.

National Plan Administrators would also "solicit eligible persons for enrollment or application for coverage, . . . draft, print, and distribute descriptive brochures and other promotional materials." Policies would be marketed exclusively through National Plan Administrators. In addenda, National Plan Administrators identified CRS as its agent for marketing the National Health policies. Both National Health and National Plan Administrators recognized that National Plan Administrators would work as an independent contractor under the agreements and would continue to provide services to other parties. It also provided for unilateral termination of the agreement by National Health for a variety of reasons. According to the Sharing Agreement, National Health would retain all profits up to five percent of the gross premiums collected for cancer policies, and any profit above that amount would be shared equally between National Health and National Plan Administrators. National Plan Administrators would determine profits, which would only be calculated after it had collected over two million dollars in annualized premiums. As an addendum, Sommerlatte personally promised to indemnify National Health from any liability it might incur from American Heritage as a result of the sale of cancer policies. After an initial enrollment, the number of active National Health policies steadily increased from around 1,000 in December 1995 to almost 7,000 in December 1997.

In the insurance industry, independent agencies rate insurers based on an evaluation of a company's balance sheet strength, operating performance, and business profile. During the time covered in this dispute, National Health's insurance rating had decreased from an A to an A-, and there was speculation in the industry that it might further deteriorate to a B+, thus making some of its policies less marketable. Already by 1996, Sommerlatte had been in conversation with another

5

underwriter, the Consolidated Companies, about marketing cancer and dread disease policies underwritten by Hartford Life Insurance Company ("Hartford"). According to a letter from Consolidated to Hartford, "Sommerlatte is very interested in talking with us to determine if Hartford would consider developing a product around key general agents in new and existing states. It is also very possible that some portions of the existing block of business could be systematically rolled to the Hartford if a deal can be cut."[4] Consolidated concluded that this would be a "very real" way that Hartford could use to "get into the cancer business without the Hartford having to incur a significant amount of acquisition costs."[5]

From 1996 to 1998, Sommerlatte had a series of meetings with various representatives of Hartford in Las Vegas, Austin, and northern California. Sommerlatte characterized those meetings as conversations with Hartford to discuss a "strategic alliance" with National Health in providing cancer policies. Nobody from National Health attended those meetings, and nobody received copies of letters or other communications concerning those meetings. In early 1998, Sommerlatte, as president of National Plan Administrators, signed a contract with Hartford to provide third-party administrator services to Hartford in connection with cancer and other disease-specific insurance policies. At the same time, Sommerlatte, as president of CRS, entered into separate marketing and agent compensation agreements with Hartford.

---

[4] A "roll over" occurs when a third-party administrator switches insurance carriers for pre-existing policies. Policies administered by that party would be underwritten by a new entity, but an insured would not apply for a new policy and no new policy papers would be issued. The type and nature of a policy may change, and an insured may not be aware of those changes.

[5] According to Lyle Rupp, a former National Health employee, in this field start-up costs are high in the first year a policy is marketed, and premiums do not cover expenses until at least the third year a policy has been offered.

Meanwhile, the number of active policies plateaued through early 1999 and began a gradual decline through September of that year, at which point they numbered just above 6,000. As well, at some point in 1998 or 1999 Sommerlatte told Smith that he was not concentrating on National Health business.

In June 1999, National Plan Administrators requested its profit share through the end of 1998. National Health responded on July 15, noting that its "active policy count ha[d] remained steady for the last 18 to 20 months with the last several months showing a downward trend. In addition, although the lack of increased new business means that most policies are in the renewal commissions phase, the loss ratios on this business continues to increase." It reported that it believed National Plan Administrator's estimates of profit were inaccurate, that there was actually little profit on those policies and asked for National Plan Administrators to forward the remainder of the remitted premiums. It communicated that it had decided to exit the line of business as a result of its own internal audit, offered to find a mutually acceptable buyer for its insurance policies, and gave National Plan Administrators 90 days to find its own buyer if it wished. It set the price for its policies at "four months of annualized premium." If National Plan Administrators could not find a buyer in 90 days, National Health had a buyer, United Teachers Insurance Association,[6] it had deemed acceptable but that United Teachers wanted to self-administer the policies rather than use National Plan Administrators.

---

[6] At that time, United Teachers was rated in the B range by independent insurance rating agencies. Sommerlatte testified that in his opinion some school districts would no longer carry National Health policies if they were sold to United Teachers.

Sommerlatte then responded to National Health and requested the financial information that National Health asserted was missing from National Plan Administrators's profit estimate. He also suggested dialogue to resolve a number of issues while they terminated their business relationship. National Health did not respond to this letter.

National Plan Administrators then approached Hartford about purchasing National Health's book of business. Hartford was not interested in buying the entire book of business but instead offered to issue replacement policies on a guarantee-issue basis only to employees who could be classified as "actively at work."[7] On June 22, Sommerlatte responded to Hartford's offer, listing employer accounts with National Health underwritten policies, the amount of the annualized premium for those accounts, and the identity of the local servicing agent. He concluded by stating that National Plan Administrators could not afford to leave a portion of customers with National Health "because they will be adversely affected by not being a part of a large policyholder base. I also am concerned that leaving a small number of policyholders would cause adverse consequences to [National Health]." However, according to one typewritten memorandum and two handwritten notes, conversations between Sommerlatte and Hartford continued to center on Hartford buying only actively-at-work policies.

---

[7] A "guarantee issue" for employees "actively-at-work" means that no employee who purchased a National Health policy and who is actively at work at the time of the transfer would be denied a similar new policy by Hartford. Employees not "actively-at-work" include employees who are on extended sick or disability leave due to, among other reasons, cancer or another "dread disease" already covered by the National Health policies. However, someone could be receiving cancer treatment and still be working, and thus be categorized as "actively-at-work."

8

On August 18, Sommerlatte wrote to National Health on National Plan Administrators's letterhead. He asked again for additional financial information concerning the cancer policies and expressed his difficulty in finding a buyer for the National Health policies on the terms set by National Health. At the end of August, Ruth Roy, a National Plan Administrators agent, sent Hartford information concerning open claims under the National Health plans. This information included the first initial and last name of the insureds on those policies. At trial, Sommerlatte denied that he had directed Roy to send the names, that Hartford had asked for them, or that he had received a copy of that communication.

On August 27, Hartford made a formal offer to accept National Health policies as a group but that it would only accept those insureds in the group who were actively at work. National Plan Administrators then notified local agents who service employer accounts that National Health had decided to exit the cancer-policy market and that Hartford had made the active-at-work-offer. It authorized those agents to present to employers the option of transferring all National Health active-at-work policies in their cafeteria plans to Hartford. All other policies would remain with National Health. CRS offered its agents an additional ten percent commission on policies they would successfully roll-over to Hartford. As a result, more than 120 of the active 150 employers accepted the Hartford offer and transferred National Health cancer policies for employees who were active at work to Hartford.[8] Others created new policies for the insureds with Hartford and

---

[8] Each entity that accepted the offer signed an "Acknowledgment Form" authorizing Hartford to assume all National Health policies under the actively-at-work terms. Sommerlatte personally signed one of these forms both on behalf of CRS and as an agent.

discontinued the National Health policies, and others created new policies with other insurers and also discontinued the National Health policies. As a result, National Health lost most of its active-at-work policies—the number of active policies in its book of business dropped in one month from just over 6,000 in September to around 1,500 in October. By November, the number of active policies dropped under 1,000, and a steady decline continued through December 2002. National Health was not informed of Hartford's final offer to National Plan Administrators, of National Plan Administrators's communications with its agents, or of the agent's efforts to change National Health policies to Hartford policies.

Throughout the course of the time period related here, Sommerlatte owned CRS and acted as the president of both CRS and National Plan Administrators. Generally in the insurance industry, marketing functions and administration functions would be performed by separate companies to avoid a conflict of interest from these functions. Marketing agents generally earn income from commissions on policies sold while third-party administrators earn from the work performed administering policies. However, according to Lyle Rupp, a former National Health employee, these companies shared office space, employees, and accounting systems with each other. The close relationship between CRS and National Plan Administrators had a particular advantage for both companies. School districts, when considering policies to add to their cafeteria plans, will limit the number of options because of the administrative costs associated with collecting premiums and forwarding them to the various administrators. By working closely with National Plan Administrators, CRS was able to develop a computer program, in the insurance industry called a common remitter, to track and collect premiums and then pay them out according to the various

10

policy accounts. Thus, in marketing insurance CRS could approach a school district with the offer that they could forward all CRS-marketed premiums for them to organize and pay the insurers. In this way, CRS would be able to market a much higher number of products to school districts because school districts would not need to consider the administrative costs of managing premiums if they were to include additional CRS products in their cafeteria plans.

National Health filed suit against National Plan Administrators on September 22, 1999, alleging breaches of contract and of fiduciary duty and seeking a declaration of its rights and responsibilities for policies which had been assigned to Hartford, exemplary damages, and attorney's fees. On September 3, 2002, National Health filed its sixth amended petition,[9] including multiple claims against National Plan Administrators, CRS, and Hartford, in addition to the original claims brought only against National Plan Administrators. The case was tried to a jury, which found breach of contract and breach of fiduciary duty against National Plan Administrators; that National Plan Administrators had misappropriated National Health's trade secrets; that the breach of fiduciary duty resulted from fraud with malice; and that National Plan Administrators and CRS acted as a single business entity. The jury assessed damages of $744,937. The district court entered a judgment against National Plan Administrators jointly and severally for actual damages in the amount of $744,937 and pre-judgment interest in the amount of $264,500. Based on the jury's finding of

---

[9] The record does not contain National Health's second through fifth amended petitions.

11

malice, the district court also awarded exemplary damages in the amount of $100,000 jointly and severally against CRS and National Plan Administrators.  This appeal followed.

## DISCUSSION

National Plan Administrators presents seven issues on appeal.  It first argues that the trial court erred in awarding damages for breach of fiduciary duty because it believes that National Health only had a cognizable cause of action for breach of contract.  It also attacks two of the jury questions submitted by the court and argues that there was no evidence or insufficient evidence of malice and to support an award of damages.[10]  CRS separately presents two issues, arguing that there is no basis to pierce the corporate veil to impose liability on it and citing article 41.006 to argue that the trial court erred in imposing punitive damages on it.  We will begin with National Plan Administrators's issues and then turn to those of CRS.

### *National Plan Administrators's Issues on Appeal*

*Breach of Fiduciary Duty*

**Existence of a Fiduciary Duty**

We begin with National Plan Administrators's third issue, in which it asserts that the trial court erred in instructing the jury that, in its role as National Health's third-party administrator,

---

[10]  We will reproduce more exactly the substance of National Plan Administrators's claims when we address each issue individually.  For the sake of convenience, we will discuss its issues in an order different from that in which it briefed them.

12

National Plan Administrators "owed [National Health] a fiduciary duty."[11]  National Plan Administrators argues that it owed a fiduciary duty by statute only to hold funds that belonged to National Health in trust but did not owe National Health a general fiduciary duty.  We disagree.

Whether a fiduciary duty exists is a question of law.  *See Fuqua v. Taylor*, 683 S.W.2d 735, 737 (Tex. App.—Dallas 1984, writ ref'd n.r.e.); *see also Rankin v. Naftalis*, 557 S.W.2d 940, 944-45 (Tex. 1977).  We review *de novo* questions of law contained in jury instructions.  *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002).

A true fiduciary is bound to serve the primary interests of the principal and to subvert his own self-interests when they are in conflict.  *See, e.g.*, *Slay v. Burnett Trust*, 187 S.W.2d 377, 387-88 (Tex. 1945); *Walker v. Federal Kemper Life Assurance Co.*, 828 S.W.2d 442, 452 (Tex. App.—San Antonio 1992, writ denied).  If the relationship between two parties does not involve the element of a solely subordinated interest, it is not a fiduciary relationship.  *Pickens v. Hope*, 764 S.W.2d 256, 267-68 (Tex. App.—San Antonio 1988, writ denied).

Common-law agency principles apply to the relationship between an insurer and its agent.  *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 385 (Tex. 2000).  The agent-principal relationship is among the types of legal relationships that give rise to general fiduciary duties.  *Lokey v. Texas Methodist Found.*, 479 S.W.2d 260, 268 (Tex. 1972); *State v. Mink*, 990 S.W.2d 779, 783 (Tex. App.—Austin 1999, pet. denied).  The scope of the agency relationship and liabilities arising

---

[11]  In its brief, National Plan Administrators asserts that the trial court instructed the jury about a "formal" or "general" fiduciary duty.  However, the record reflects that trial court instructed the jury only that National Plan Administrators owed National Health "*a* fiduciary duty." (emphasis added).

13

under it may be limited by contract or by statute. *Casteel*, 22 S.W.3d at 385. To the extent that common-law principles contradict a statute or the terms of the contract, we will read the statute or the contract to modify the common-law principles. *Id.* When the existence of an agency relationship depends upon the interpretation of an unambiguous document, the issue is one of law to be determined by the court. *Norton v. Martin*, 703 S.W.2d 267, 272 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.); *Purser*, 361 S.W.2d at 241. Essential to an agency relationship is the principal's "right to assign the agent's task and to control the means and details of the process by which the agent will accomplish the task." *Webster v. Lipsey*, 787 S.W.2d 631, 635 (Tex. App.—Houston [14th Dist.] 1990, writ denied).

We begin with the language and structure of the insurance code to determine whether an agency relationship exists in this case. In the insurance code the legislature regulates the activities of many entities that act as agents in the insurance industry. *See generally* Tex. Ins. Code Ann. arts. 21.01-.15-5 (West 1981 & Supp. 2004) (subchapter A). In subchapter A, an agent is:

> Any person who solicits insurance on behalf of any insurance company, whether incorporated under the laws of this or any other state or foreign government, or who takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or inspect any risk, or receive, or collect, or transmit any premium of insurance, or make or forward any diagram of any building or buildings, or do or perform any other act or thing in the making or consummating of any contract of insurance for or with any such insurance company other than for himself, or who shall examine into, or adjust, or aid in adjusting, any loss for or on behalf of any such insurance company, whether any of such acts shall be done at the instance or request, or by the employment of such insurance company, or of, or by, any broker or other person, shall be held to be the agent of the company for which the act is done, or the risk is taken, as far as relates to all the liabilities, duties, requirements and penalties set forth in this chapter.

14

*Id*. art. 21.02(a) (West Supp. 2004).[12] In general, persons may not act as insurance agents unless they have been licenced by the department of insurance. *Id*. art. 21.07, § 1(a).

Among these regulated agents are third-party administrators. *Id*. art. 21.07-6. According to article 21.07-6, a third-party administrator is "a person who collects premiums or contributions from or who adjusts or settles claims in connection with life, health, and accident benefits, including pharmacy benefits, or annuities for residents of this state." *Id*. § 1(1). However, the regulations concerning third-party administrators do not extend to agents licensed under article 21.07 who are acting under appointment on behalf of an insurance company and within the customary scope and duties of the authority of an insurance agent's as an agent and who receive commissions as an agent. *Id*. § 1(1)(E). A third-party administrator must hold a certificate of authority to do business as an administrator. *Id*. § 3. Thus, a third-party administrator is not a licensed agent under section 1(a) of article 21.07, although it remains an agent under article 21.02(a).

---

[12] In subchapter A, "agent" may also be defined as

> a person who is an authorized agent of an insurance company or health maintenance organization, any person who is a subagent of an agent, and any other person who performs the acts of an agent, whether through an oral, written, or electronic communication or otherwise, in the solicitation of, negotiation for, procurement of, or collection of premiums on an insurance or annuity contract, or who represents or purports to represent a health maintenance organization, including a health maintenance organization offering only a single health care service plan, in the solicitation of, negotiation for, procurement of, or effectuation of membership in the health maintenance organization.

Tex. Ins. Code Ann. art. 21.07, § 1A(1) (West Supp. 2004). For purposes of our discussion in this opinion, we discern no substantive difference between these definitions.

15

In addition to the duties a third-party administrator owes its principal, the legislature has created additional ones relevant to their specific context. *See* Tex. Ins. Code Ann. art. 21.07-6. For example, a third party-administrator may only provide its services pursuant to written agreements. *Id*. § 11. It must carry a fidelity bond to protect against its acts of fraud or dishonesty. *Id*. § 6(e). It must hold premiums and other funds collected on behalf of its principal in a fiduciary capacity.[13] *Id*. § 17(a).

We now turn to the "Administrative, Compensation and Claim Service Agreement" that created the relationship between National Plan Administrators and National Health. Under the terms of that agreement, National Plan Administrators was to solicit possible insureds; receive applications and process them according to National Health's guidelines; record the payment of premiums; maintain accounting, administrative, and statistical records for National Health concerning premiums and coverages; service and investigate claims; and manage policy funds, among other duties. The terms of this agreement gave control of large amounts of information concerning the volume and quality of National Health's book of business, as well as the market competitiveness of lines of policies and information about renewals and new policies. By the terms of the written agreement, National Plan Administrators actually exercised control over the possible value of a book of business as a result of its obligation to market National Health's insurance

---

[13] National Plan Administrators concedes that it should hold such funds in trust for the insurer and that the legislature deemed this trust relationship to be fiduciary duty in nature, distinct from any other duties a third-party administrator might have by contract, law, or equity. *See Anton v. Merrill Lynch*, 36 S.W.3d 251, 256 n.5 (Tex. App.—Austin 2001, pet. denied) (expressing doubt whether plaintiff who argued at trial that defendant was trustee could argue on appeal that defendant was agent).

16

product.[14] We recognize that we ought not create fiduciary duties lightly. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176-77 (Tex. 1997).[15] However, given the structure of the statutes regulating agents in the insurance industry generally, the scope of the statute regulating third-party administrators in particular, and the details of the written agreement between National Health and National Plan Administrators, we hold that National Plan Administrators generally owed a fiduciary duty to National Health. We overrule National Plan Administrators's third issue.

**Burden of Proof to Show Compliance with Fiduciary Duty**

In its sixth issue, National Plan Administrators argues that the trial court erred in submitting a question to the jury that placed the burden of proof on it to show compliance with its fiduciary duty to National Health.

Texas courts have applied a presumption of unfairness to transactions between a fiduciary and a party to whom it owes a duty of disclosure, thus casting on the profiting fiduciary the

---

[14] We note again that CRS was not a party to a written agreement with National Health. Rather, National Plan Administrators revealed in an addendum to the agreement that CRS would act as its agent in marketing National Health policies.

[15] National Plan Administrators cites *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 176-77 (Tex. 1997), for the proposition that there "must be a relationship of trust and confidence before and apart from the agreement made the basis of the suit" for a fiduciary duty to be established. However, that case concerned the relationship between parties in a contractual *partnership*, not the relationship between an agent and principal. *See id.* In addition, in *Swanson* the supreme court relied on *Transport Insurance Co. v. Faircloth*, 898 S.W.2d 269, 279-80 (Tex. 1994). In *Faircloth*, the supreme court considered the fiduciary duty an insurer might owe a third-party claimant in addition to any duty it owed an insured. 898 S.W.2d 279. The third-party claimant had no dealings with the insurance company apart from a claim she had against the insured. *Id.* Because she had no reason to place a high degree of trust in the insurer, no special relationship arose before or during the settlement negotiations which could give rise to fiduciary duties. *Id.* Neither *Swanson* nor *Faircloth* deal with an *agency* relationship that arises out of a contract and are therefore inapplicable to this case.

17

burden of showing the fairness of the transactions. *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 509, 507-09 (Tex. 1980); *Sorrell v. Elsey*, 748 S.W.2d 584, 586 (Tex. App.—San Antonio 1988, writ denied); *Gum v. Schaefer*, 683 S.W.2d 803, 806 (Tex. App.—Corpus Christi 1984, no writ) (benefitting fiduciary has burden of presenting evidence and securing finding that confidential relationship was not breached). The burden cast upon the fiduciary not only includes presenting evidence but securing findings of the material issues—whether the fiduciary had made reasonable use of the confidence placed in him and whether the transactions were ultimately fair and equitable. *Sorrell*, 748 S.W.2d at 586. The "unfairness of transactions" test includes transactions involving the fiduciary and a third party, conducted on behalf of the beneficiary of the fiduciary relationship. *See Stephens Co. Museum, Inc. v. Swenson*, 517 S.W.2d 257, 260-61 (Tex. 1974) (when brother, acting under power-of-attorney for sisters, made large gifts of sisters' wealth to museum, "equity indulges the presumption of unfairness and invalidity, and requires proof at the hand of the party claiming validity and benefits of the transaction that it is fair and reasonable"). The fiduciary must show proof of good faith and that the transaction was fair, honest, and equitable. *Id*.; *Miller v. Miller*, 700 S.W.2d 941, 946-47 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Only when the presumption of unfairness does not arise will the burden of persuasion not fall on the fiduciary. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment*, PJC 104.2 cmt. (2002); *see also Gum*, 683 S.W.2d at 804-06 (partners, as confidential agents of each other, owed fiduciary duty when purchasing partnership interests from each other).

18

In this case, the alleged breach of fiduciary duty occurred when National Plan Administrators revealed National Health's confidential policy information to Hartford and then moved National Health's active-at-work book of business to them. This transaction allegedly benefitted National Plan Administrators not only in that it allowed them to control the buyer and terms of the sale of the book of business but also in that National Plan Administrators was then able to continue administering the policies under a new contract with Hartford rather than losing that business to the alternate buyer in negotiations with National Health. National Plan Administrators was also able to accomplish this move without compensating National Health for the value of its book of business. Thus, in this case the presumption of unfairness applies, and the burden properly rested on National Plan Administrators to show the fairness of the transaction.

In such cases, *Texas Pattern Jury Charges* suggests this introduction to the jury question:

> QUESTION _____
>
> Did *Don Davis* comply with *his* fiduciary duty to *Paul Payne*?
>
> [*Because a relationship of trust and confidence existed between them*,] [*As Paul Payne's attorney*,] [*Because they were partners*,] [*As Paul Payne's agent*,] *Don Davis* owed *Paul Payne* a fiduciary duty. To prove *he* complied with *his* duty, Don Davis must show. . . .

*Texas Pattern Jury Charges* PJC 104.2 (emphasis in original). Only when the presumption of unfairness does not arise would the language shift the burden—"Did *Don Davis* fail to comply with *his* fiduciary duty to *Paul Payne*?" *Id*. cmt. The instruction would then also be modified to place the burden of persuasion. *Id*.

19

In this case, the court submitted the following relevant language:

> Did [National Plan Administrators] fail to comply with its fiduciary duty to [National Health]?
>
> You are hereby instructed that, in its role as [National Health's] third-party administrator, [National Plan Administrators] owed [National Health] a fiduciary duty. To prove that it complied with its duty, [National Plan Administrators] must show. . . .

Thus, the question submitted to the jury—whether National Plan Administrators failed to comply with its fiduciary duty—placed the burden of persuasion on National Health. *See id.* The instruction, in contrast, by requiring National Plan Administrators to prove that it complied with its duty, placed the burden of persuasion on National Plan Administrators, where it properly belonged. *See id.* Thus, the error in this case possibly shifted the burden to National Health and could only have prejudiced National Health, the party who ultimately prevailed. As a result, we believe that this error did not harm National Plan Administrators. We overrule National Plan Administrators's sixth issue.

**Breach of Fiduciary Duty and Breach of Contract**

In its first issue, National Plan Administrators argues that the trial court erred in awarding National Health damages for breach of fiduciary duty. In particular, it asserts that, because the parties' relationship was created by and governed by a contract, National Health had a viable cause of action only for breach of contract. We disagree.

Many of the same operative facts that can give rise to a cause of action for breach of contract may also give rise to causes of action for business torts. *See Hill v. Heritage Res.*, 964

S.W.2d 89, 111 (Tex. App.—El Paso 1999, pet. denied). The concept that contractual obligations arise from an agreement between the parties whereas a tort obligation is imposed by law separate from any contractual undertaking seems evident. However, application of the concept is not so clear cut. *See id.*; *compare also Airbourne Freight Corp., Inc. v. C. R. Lee Enters., Inc.*, 847 S.W.2d 289, 295-96 (Tex. App.—El Paso 1992, pet. denied), *with Beneficial Personnel Servs. of Texas, Inc. v. Rey*, 927 S.W.2d 157, 167-68 (Tex. App.—El Paso 1996) (vacated pursuant to settlement without reference to the merits). Minimally, any analysis must consider the source of the duty and the nature of the remedy sought to determine the independence of tort claims from their associated contract claims. *See generally Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998) (reviewing distinctions between tort and contract claims). The contractual relationship of the parties can create duties under both contract law and tort law, the "nature of the injury most often determines which duty or duties are breached." *Reed*, 711 S.W.2d at 618.

Breach of fiduciary duty is a tort. *See Brosseau v. Ranzau*, 81 S.W.3d 381, 389 (Tex. App.—Beaumont 2002, pet. denied); *Douglas v. Aztec Petroleum Corp.*, 695 S.W.2d 312, 318 (Tex. App.—Tyler 1985, no writ). The acts of a party may breach duties in tort or contract alone or simultaneously in both. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). If a defendant's conduct—such as negligently burning down a house—would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. *Southwestern Bell Tel. Co. v. Delanney*, 809 S.W.2d 493, 494 (Tex. 1991). When the only loss or damage is to the subject matter of the contract—such as failing to publish an advertisement as required by a contract—would give rise to liability only because it breaches the parties'

21

agreement, the plaintiff's claim ordinarily sounds only in contract. *Id*. For example, the duty to pay the legal fees of a beneficiary to a trust for a challenge or interpretation of the trust may be created by contract and enforceable only under its terms. *See Creel v. Houston Indus.*, 124 S.W.3d 742, 753 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Some contracts involve special relationships that may give rise to duties enforceable as torts. *Id*. n.1. When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone. *Reed*, 711 S.W.2d at 618. We examine the nature of the injury as alleged to determine which duty or duties are breached. *Id*.; *see also Formosa Plastics Corp. USA*, 960 S.W.2d at 45.

In this case, National Health alleged "economic benefits realized by" National Plan Administrators and CRS through its transaction with Hartford. It claimed that National Plan Administrators and CRS were unjustly enriched because of the breach of their fiduciary duty. It claimed the breach occurred when National Plan Administrators transferred National Health policies to Hartford while leaving the policies with the greatest risk with National Health. It also claimed that National Plan Administrators revealed confidential information to Hartford. These alleged breaches arose from National Plan Administrators's duties of loyalty, fidelity, and honesty that arise from its fiduciary role as National Health's agent. National Health claimed damages, in part, from the loss of the benefit of a prospective sale of its book of business and a decrease in the amount of funds available to pay claims under the policies remaining with National Health. These are not claims governed by the contract in this case, such as the duties to market and administer National Health's policies. These are not claims for the loss of premiums from the lost book of business.

22

Thus, these breaches rightly sound in tort as a breach of fiduciary duty.[16] We overrule National Plan Administrators's first issue.

**Legal and Factual Sufficiency of the Evidence**

In its second issue, National Plan Administrators argues that it does not have a fiduciary duty to an insurance carrier "outside the limited, statutorily required, duty to hold funds of an insured and a carrier 'in a fiduciary capacity." Because National Health presented no evidence of a breach of that duty, National Plan Administrators believes that the jury's finding warrants reversal.

We have already decided above that National Plan Administrators owed National Health a general fiduciary duty as its third-party administrator. Thus, we must consider National Plan Administrators's challenge in the context of that general duty. However, National Plan Administrators presented no argument on the evidence concerning its general fiduciary duty, either in the form of cited authority or argument concerning the record. *See* Tex. R. App. P. 38.1(h). Thus, to the extent that National Plan Administrators argues that the evidence is insufficient to support a finding of breach of its general fiduciary duties, that argument has been waived. *See Trenholm v. Radcliff*, 646 S.W.2d 927, 934 (Tex. 1983); *see also Fredonia State Bank v. General Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (appellate court has discretion to waive issues due to inadequate briefing). We overrule National Plan Administrators's second issue.

---

[16] We note that the jury in this case seemed to understand this distinction. It found both a breach of fiduciary duty and a breach of contract, but it awarded damages only for the breach of fiduciary duty. Evidently, it considered the breach of contract and found *no damages* as a result of a breach of any duties created and governed by the contract.

**Jury Question on Damages**

In its fourth issue, National Plan Administrators argues that the court submitted to the jury an improper measure of damages on the breach of the fiduciary duty. We disagree.

When a trial court exercises its discretion in submitting special issues to the jury, we will only reverse when a clear abuse of that discretion is shown. *DeAnda v. Home Ins. Co.*, 618 S.W.2d 529, 534 (Tex. 1980); *Chrysler Corp. v. McMorries*, 657 S.W.2d 858, 862 (Tex. App.—Amarillo 1983, no writ). In reviewing the trial court's exercise of its discretion, we recognize that under Rule 277 the trial court's discretion is subject only to the requirement that the disputed issues must be fairly submitted for the jury's determination. Tex. R. Civ. P. 277; *McMorries*, 657 S.W.2d at 862; *Baker Marine Corp. v. Moseley*, 645 S.W.2d 486, 488-89 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.); *Cactus Drilling Co. v. Williams*, 525 S.W.2d 902, 906-07 (Tex. Civ. App.—Amarillo 1975, writ ref'd n.r.e.). That is, the form of the submission must be sufficient to enable the jury to make an award of damages on proper grounds and correct principles of law. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex. 1973); *McMorries*, 657 S.W.2d at 862. A submission is fatally defective if it fails to guide the jury to a finding on any proper legal measure of damages. *Jackson*, 499 S.W.2d at 90; *McMorries*, 657 S.W.2d at 862.

In this case, the trial court submitted one damages question to the jury, and the jury determined the following damages resulting from a breach of fiduciary duties:[17]

---

[17] The dates in Question 9 were meant to approximate the filing of suit for the breach, which occurred relatively close in time to the actual breach, and the beginning of trial in early 2003. In any event, National Plan Administrators does not challenge the date ranges in this issue.

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [National Health] for its damages, if any, that resulted from breach of fiduciary duty?

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any.

Consider the following elements of damages, if any, and none other:

a. The value of the [National Health] book of business negotiated between [National Health] and United Teachers Insurance Association.

ANSWER: $ 0.00

b. The amount of claims paid by [National Health] in excess of premiums received from October 1, 1999 to December 31, 2002.

ANSWER: $ 520,037.00

c. The future amount of claims paid in excess of premiums received after January 1, 2003.

ANSWER: $ 224,900.00

d. The lost profits on the book of business for each of the following years:

| | |
|---|---|
| 2000 | ANSWER: $ 0.00 |
| 2001 | ANSWER: $ 0.00 |
| 2002 | ANSWER: $ 0.00 |
| 2003 | ANSWER: $ 0.00 |
| 2004 | ANSWER: $ 0.00 |

National Plan Administrators focuses on appeal on sections 9(b) and 9(c), asserting that they do not compare National Health's economic positions before and after the breach of fiduciary duty.

However, by focusing only on the sub-parts of Question 9 in isolation, National Plan Administrators misinterprets the damages as measured by that question. In Question 9, the trial court asked the jury to consider the value of the remainder of the book of business that National Health was able to negotiate on its own (subsection 9(a)). The jury then had to consider the amount of past and future losses on the policies that remained with National Health after the breach (subsections 9(b) and (c)). These amounts measured net losses. Finally, it had to consider the profits that the *entire* book of business would have generated but for the breach (subsection 9(d)). That is, this amount was a measure of the profitability that would have resulted if profits from the policies that left National Health had been used to offset the losses on the policies that remained with National Health. The values of these categories were disputed in this case, and by submitting them to the jury the trial court properly gave the jury guidance to make a determination of their values. Reading Question 9 as a whole and considering the jury's answers, which valued the losses on the remaining policies at $724,937 and valued the profit on the entire book of business at zero dollars, the trial court divided the elements of the damages in a way to determine an actual amount of loss that resulted from the breach. In essence, the jury decided that National Health incurred a loss on the portion of the book of business it retained but that the book of business, as a whole, would have generated zero profit (rather than a positive or negative profit) had it all been kept as one unit. Together, these amounts would result in a determination of damages actually suffered—total profit on the book of business offset by the total loss on the remaining policies. We find no clear abuse of discretion in this case. We overrule National Plan Administrators's fourth issue.

26

*Sufficiency of the Evidence*

In its fifth and seventh issues, National Plan Administrators asserts that there is no evidence or insufficient evidence on which to base either an award of damages for the breach of fiduciary duty or a finding of malice.

In reviewing the evidence under a no-evidence point, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Formosa Plastics Corp. USA*, 960 S.W.2d at 48; *see also Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993). However, when an appellant challenges the factual sufficiency of the evidence on an issue on which it did not have the burden of proof, it must demonstrate the evidence is insufficient to support the adverse finding. *17090 Parkway, Ltd. v. McDavid*, 80 S.W.3d 252, 258 (Tex. App.—Dallas 2002, pet. denied); *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ). In reviewing a factual insufficiency point, we consider, weigh, and examine all the evidence presented at trial. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside a finding for factual insufficiency only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

**Damages**

In its fifth issue, National Plan Administrators asserts that there was no evidence or insufficient evidence to support an award of damages for the breach of fiduciary duty. In particular, it repeats its claim that there was no analysis of a change in National Health's status before and after the breach. It also argues that there was no evidence of causation, that National Health offered no evidence that it would have retained any of the policies had the breach not occurred, that there was no evidence of benefit-of-the-bargain damages, and that in awarding damages the jury pulled "a figure out of a hat." We will address each argument in turn.

<u>Comparison in Status Before and After the Breach</u>

First, National Plan Administrators argues that the jury charge itself defectively described the measure of damages. Because National Health's evidence tracked the measure of damages as asserted in the charge, National Plan Administrators asserts that the evidence is insufficient for an award of damages. However, we have already determined that the trial court did not abuse its discretion in submitting the charge, as reproduced above. Thus, we reject National Plan Administrators's first challenge to the sufficiency of the evidence of the damages award.

<u>Causation</u>

Next, National Plan Administrators presents two challenges to the evidence of causation of the damages in this case—that National Health presented insufficient evidence to link the breach of fiduciary duty with the actively-at-work offer and that it did not present any evidence of damages that resulted because of the actively-at-work offer. We disagree.

28

We begin with National Plan Administrators's argument that the evidence in this case shows that some policies moved to Hartford through the decisions of employers who controlled the cafeteria plans and through individual underwriting decisions. Because about ten percent of the policies transferred to a carrier other than Hartford, and some of the policies lapsed, National Plan Administrators asserts that National Health has not proven that the fiduciary breach caused the damages that resulted in this case. However, testimony and evidence in the record supports the conclusion that the actively-at-work offer resulted from National Plan Administrator's negotiations with Hartford—its sharing of insured account information, premium amounts, loss ratios, and other related information. These actions formed the basis of the fiduciary breach. In addition, without these negotiations and the marketing of Hartford's replacement policies on the part of National Plan Administrators, employers would not have moved their accounts over to Hartford nor would agents who worked for National Plan Administrators have actively promoted Hartford as an alternative to National Health's policies. We find this evidence sufficient to support the jury's finding of a link between the breach of fiduciary duty and the actively-at-work offer.

Next, we consider National Plan Administrators's argument that its actions merely "furnished a condition which made the injury possible." *See Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995) (analyzing proximate cause element). In essence, it asserts that the evidence is insufficient to support a finding of proximate cause.

The components of proximate cause are cause in fact and foreseeability. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). These elements cannot be established by mere conjecture, guess, or speculation. *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex.

29

1980); *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 755 (Tex. 1975). The test for cause in fact is whether the negligent "act or omission was a substantial factor in bringing about injury," without which the harm would not have occurred. *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 477. Cause in fact is not shown if the defendant's negligence did no more than furnish a condition which made the injury possible. *See Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex. 1968). Instead, the evidence must go further and "show that such negligence was the proximate, and not the remote, cause of resulting injuries . . . . [and] justify the conclusion that such injury was the natural and probable result thereof." *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 477 (quoting *Carey v. Pure Distrib. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939)); *see also Boyd v. Fuel Distribs., Inc.*, 795 S.W.2d 266, 272 (Tex. App.—Austin 1990, writ denied) (holding that convenience store's sale of beer to eighteen-year-old was not cause in fact of drunk driver's fatal car accident because sale was to passenger and not to driver). "In other words, even if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause." *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 477; *see also Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex. 1995).

After careful review of the record, we conclude that the evidence in this case supports the conclusion that the damages resulted because of the fiduciary breach. Although National Health's book of business was not increasing in volume when it decided to exit the market, evidence in the record establishes that at that time Sommerlatte was actively pursuing a business relationship with Hartford concerning the same types of policies it was offering from National Health. In addition, the departure of policies from National Health after Sommerlatte concluded negotiations

30

with Hartford was immediate and rapid. Given this evidence and the evidence we reviewed above concerning the link between the actively-at-work offer and the fiduciary breach, we find the evidence sufficient to establish proximate cause in this case.

### Benefit of the Bargain

Next, National Plan Administrators argues that the evidence is insufficient to support damages based on the benefit of the bargain of the Administrative Agreement and that benefit-of-the-bargain damages were not measured from the date of the breach of that agreement. The "benefit of the bargain" is a measure of contract damages, not tort. *See, e.g.*, *Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex. 1995); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994). Although the jury in this case found a breach of contract, it awarded no damages for that breach, and the trial court entered no damages award in its judgment for that breach. Additionally, we have already determined that the cause of action in this case appropriately sounded in tort. Thus, we have no need to discuss the substance of National Plan Administrator's benefit-of-the-bargain arguments.

### Jury's Determination of Damages

On the issue of damages, National Plan Administrators presents one final argument—that the jury arbitrarily assessed an amount not supported by the evidence. In particular, National Plan Administrators asserts that the jury arbitrarily pulled "figures out of a hat" and thus had no principled basis for arriving at its damages figures. *See, e.g.*, *Neiman-Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 372 (5th Cir. 1990).

As a general rule, the jury has the broad discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for its calculation. *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied). The jury must engage in "an honest endeavor to ascertain damages sustained in light of the attendant facts and conditions." *General Motors Corp. v. Grizzle*, 642 S.W.2d 837, 845 (Tex. App.—Waco 1982, writ dism'd). The jury's findings will not be disregarded merely because its reasoning in arriving at its figures may be unclear. *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied); *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 710 (Tex. App.—Houston [1st Dist.] 1988, writ denied). When a precise method for determining damages is offered, a jury may not arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial. *Keilman*, 851 S.W.2d at 930. A jury's finding may be disregarded if the amount assessed "was not the result of a deliberate and conscientious conviction in the minds of the jury and the court." *Id.* (quoting *Mills v. Jackson*, 711 S.W.2d 427, 431 (Tex. App.—Fort Worth 1986, no writ)). The fact that there is nothing in the record to evidence how the jury arrived at a specific amount is not necessarily fatal to the verdict. *Mayberry*, 948 S.W.2d at 317. Instead, when the evidence supports a range of awards, as opposed to two distinct options, an award of damages within that range may be an appropriate exercise of the jury's discretion. *Id.*

In this case, National Health offered the testimony of its employee Mary Smith, an accountant, to establish the damages that resulted from the breach of fiduciary duties. She analyzed National Health's data concerning claim expenses and remitted premiums. Considering the reported

data for the period of October 1, 1999, to December 31, 2002,[18] she concluded that the amount of excess claims over premiums after the breach amounted to $1,040,074. Turning to the issue of projected losses,[19] she projected $449,800 in losses. For future losses, National Health also offered the testimony of Jeff Anderson, National Health's treasurer. He prepared a calculation of the value of future claim payments that took into account an average lapse rate of 1.88%.[20] Calculating losses into 2012, he also determined the present value of projected losses to be $449,800.

National Plan Administrators presented evidence that National Health's losses may have been due, in part, to factors other than the breach. It may have lost some policies to consumer choice. Some monetary losses may have resulted from claims that were open before the breach occurred. We conclude that the jury in this case was not faced with choosing between a precisely calculated damages amount or no damages. Rather, it was given a range of damages, from none to the actual loss amounts at the time of the breach and projected into the future. It heard evidence and argument concerning other factors which may have caused losses. It decided that National Health's damages equaled $520,037 in past damages and $224,900 in future damages. Thus, it concluded that, of all of National Health's losses on the book-of-business after the breach, only half were caused by National Plan Administrator's breach of its fiduciary duties. Given the evidence in this case, we find the jury's conclusion to be within its discretion. *See Mayberry*, 948 S.W.2d at 317.

---

[18] This period corresponds to Question 9(b) of the jury charge.

[19] Question 9(c) of the charge relates to Mary Smith's testimony concerning future losses.

[20] Anderson took the average rate at which active policies lapsed for the six months prior to December 2002, a period during which he believed the remaining book of business was relatively stable.

33

<u>Conclusion as to the Sufficiency of the Evidence of Damages</u>

Having reviewed National Plan Administrators's arguments and the evidence in this case, we overrule its fifth issue challenging the sufficiency of the evidence supporting the jury's damages award for National Plan Administrators's breach of its fiduciary duty.

**Malice**

In its seventh issue, National Plan Administrators asserts that there is no evidence or insufficient evidence to support the jury's determination that the harm caused by National Plan Administrators's conduct resulted from malice.[21] We disagree.

At all times relevant for this case, the civil practices and remedies code defined "malice" to mean:

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

    (i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

    (ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

---

[21] The jury's finding of malice was used to support an award of exemplary damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (West Supp. 2004).

Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, 2003 Tex. Gen. Laws 847, 887 (Former § 41.001(7)).  We also bear in mind that the supreme court, in recognizing the right to a recovery of exemplary damages, has admonished that we "should not say to defaulting fiduciaries that the most for which they can be held accountable in equity are the profits which would have remained theirs had they not been called to account." *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 584 (Tex. 1963).

Chapter 41's second definition of malice consists of two prongs.  *North Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 127 (Tex. App.—Beaumont 2001, pet. denied).  The first part describes an objective prong, and the second defines a subjective prong.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7)(B); *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 325-26 (Tex. 1993).  Malice involves more culpable conduct than ordinary negligence with respect to both elements.  *Alexander*, 868 S.W.2d at 325-26.  Objectively, the defendant's conduct must involve an extreme risk of harm, a threshold significantly higher than the objective reasonable person test for negligence.  *Id.* at 326.  Subjectively, the defendant must have actual awareness of the extreme risk created by the conduct.  *Id.*; *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994).  For a finding of malice to be sustained on appeal, the evidence "must show both that the act was likely to result in serious harm and that the defendant was consciously indifferent to the risk of harm." *Moriel*, 879 S.W.2d at 22; *see also Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998).  Evidence of simple negligence alone is not enough.  *Emmons*, 50 S.W.3d at 128.  As the supreme court has explained:

35

> Determining whether an act or omission involves extreme risk or peril requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. In every negligence or gross negligence case, some injury has allegedly occurred. However, the magnitude of the injury may be entirely disproportionate to the riskiness of the behavior . . . . If somebody has suffered grave injury, it may nevertheless be the case that the behavior which caused it, viewed prospectively and without the benefit of hindsight, created no great danger.

*Moriel*, 879 S.W.2d at 23.

In this case, National Plan Administrators had access to all National Health's proprietary information concerning its book of business. It knew the value of the book of business, the number of policies sold, and the number and types of claims made on the policies. It also knew about the growth rate of the book of business. Sommerlatte, who was president of National Plan Administrators, actively engaged in negotiations with Hartford before National Health decided to exit the market. After receiving notice of National Health's decision, Sommerlatte continued negotiations with Hartford, fully aware of Hartford's actively-at-work offer and its probable implications for National Health.

Sommerlatte's written statements expressing concern over the effect of a "roll-over" from National Health to Hartford may constitute some evidence against the finding of malice. Nevertheless, National Plan Administrators was aware of National Health's financial situation and its declining industry ratings. In addition, National Plan Administrators reached a deal with Hartford, and through its agents and its contacts with its clients—the school districts—it effectively transferred most of National Health's actively-at-work policies to Hartford in spite of knowledge of the effect of the transfer and without agreement from National Health. Given the nature of the

36

fiduciary duty in this case and the breach of that duty, we find this evidence legally and factually sufficient to support the jury's finding of malice under the former section 41.001(7)(B) definition. We overrule National Plan Administrators's seventh issue.

*CRS's Issues*

On appeal, CRS presents two issues. First, it argues that the trial court erred in rendering judgment against it because it asserts that there is no basis by which to pierce the corporate veil to impose liability on it for the actions of National Plan Administrators. Second, it argues that the trial court had no basis on which to award punitive damages under section 41.006 of the civil practices and remedies code.

### *Piercing the Corporate Veil*

In its first issue, CRS points out that the only theory under which the trial court pierced the corporate veil to assess damages against CRS was through the theory that CRS and National Plan Administrators operated as a "single business entity." CRS argues that this theory is not a viable theory in Texas for imposing liability on a corporate affiliate for debts related to or arising from a contractual obligation. Instead, it asserts that article 2.21 of the Texas Business Corporations Act is the only means by which National Health could recover against CRS. It also argues that, in any event, the evidence is legally and factually insufficient to impose liability.

CRS begins by arguing that the dispute in this case relates to or arises from a contractual obligation and thus is controlled by article 2.21 rather than by any common-law theories

for piercing the corporate veil. *See* Tex. Bus. Corp. Act Ann. art. 2.21A(2) (West 2003).[22] In any

event, it asserts that the evidence is legally and factually insufficient to support a finding that it and

---

[22] In pertinent part, article 2.21 provides:

   A.   A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:

   * * *

      (2)   any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate.

   * * *

   B.   The liability of a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for an obligation that is limited by Section A of this article is exclusive and preempts any other liability imposed on a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for that obligation under common law or otherwise . . . .

Tex. Bus. Corp. Act Ann. art. 2.21A(2), B (West 2003).

In particular, CRS argues the obligations that the actions that gave rise to damages in this case arose from a contractual obligation and that article 2.21 mandates that a fact finder must determine whether it "caused" National Plan Administrators "to be used for the purpose of perpetrating and did perpetrate an actual fraud" on National Health. *See id.*; *Southern Union Co. v. City of Edinburg*, 129 S.W.3d 74, 85-87 (Tex. 2003); *Minetti v. Chavers*, 974 S.W.2d 168, 174 (Tex. App.—San Antonio 1998, no pet.).

National Plan Administrators acted as a single business enterprise.  In response, National Health argues that CRS waived this argument by failing to object with specificity to the charge and that the evidence is sufficient to support a finding as charged.[23]

National Health drafted one question for the jury to support piercing the corporate veil, asking if National Plan Administrators and CRS operated as a single business enterprise.  *See In re U-Haul Int'l*, 87 S.W.3d 653, 657 (Tex. App.—San Antonio 2002, no pet.); *Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 68 (Tex. App.—Texarkana 2000, no pet.); *Hall v. Timmons*, 987 S.W.2d 248, 255-56 (Tex. App.—Beaumont 1999, no pet.).  CRS objected to the question "because there is no cause of action in Texas for 'single business enterprise.'"

For the purposes of legal proceedings, subsidiary corporations and parent corporations are separate and distinct "persons" as a matter of law and the separate entity of corporations will be observed by the courts even where one company may dominate or control, or even treat another company as a mere department, instrumentality, or agency.  *Valero South Texas Processing Co. v. Starr County Appraisal Dist.*, 954 S.W.2d 863, 866 (Tex. App.—San Antonio 1997, pet. denied).  Courts are willing to disregard the corporate form when it is used as part of an unfair device to achieve an inequitable result, such as when a corporation is organized and operated as a mere tool or business conduit of another corporation, or when the corporate fiction is resorted to as a means of evading an existing legal obligation.  *Castleberry v. Branscum*, 721 S.W.2d 270, 271-72 (Tex. 1986).  Under the "single business enterprise" doctrine, when corporations are not operated as separate entities, but rather integrate their resources to achieve a common business purpose, each

---

[23]  National Health also argues that article 2.21A(2) does not control in this case.

constituent corporation may be held liable for the debts incurred in pursuit of that business purpose. *Old Republic Ins. Co. v. Ex-Im Servs. Corp.*, 920 S.W.2d 393, 395-96 (Tex. App.—Houston [1st Dist.] 1996, no writ).

Upon appeal, all independent grounds of recovery not conclusively established under the evidence and no element of which is submitted or requested are waived. Tex. R. Civ. P. 279. The supreme court has not spoken on the issue of the viability of the single-business-enterprise theory. *See Southern Union Co. v. City of Edinburg*, 129 S.W.3d 74, 87 (Tex. 2003) ("We need not decide today whether a theory of 'single business enterprise' is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure and the theories of joint venture, joint enterprise, or partnership for imposing joint and several liability."). However, within the past five years three of our sister courts have recognized the single-business-enterprise theory as a valid equitable means of piercing the corporate veil to impose liability. *See In re U-Haul Int'l*, 87 S.W.3d at 657; *Aluminum Chems. (Bolivia), Inc.*, 28 S.W.3d at 68; *Hall*, 987 S.W.2d at 255-56. We also recognize it as such. Thus, National Health submitted a question to recover from CRS by piercing the corporate veil, and the burden then fell on National Plan Administrators to object to the charge and "point out distinctly the objectionable matter and the grounds of the objection." Tex. R. Civ. P. 274. The purpose of Rule 274 is to afford trial courts an opportunity to correct errors in the charge, by requiring objections both to designate the error clearly and to explain the grounds for complaint. *Brown v. American Transfer & Storage*, 601 S.W.2d 931, 938 (Tex. 1980); *Davis v. Campbell*, 572 S.W.2d 660, 663 (Tex. 1978). An objection that does not meet both requirements is properly overruled and does not preserve error on appeal. The record does not reflect that National

Plan Administrators submitted its own instruction on this issue or informed the court of its view that article 2.21 controlled. Therefore, this complaint has not been preserved for review. *See* Tex. R. App. P. 33.1; *Hall*, 987 S.W.2d at 255-56.

CRS next argues that the evidence is legally and factually insufficient to support the jury's determination that National Plan Administrators and CRS operated as a single business entity for two reasons. First, it argues that the jury charge failed to include two elements necessary for a finding that two corporate entities operate as a single business enterprise. In particular, CRS believes that the single-business-enterprise theory includes three elements: (i) that the entities operate as a single business enterprise; (ii) that the entities "integrated their resources to achieve a common business purpose;" and (iii) that the debts arise out of that common business purpose. *See In re U-Haul Int'l*, 87 S.W.3d at 657. Because the jury charge failed to ask the jury to determine facts under the second two elements, CRS argues that the evidence is insufficient to support a finding that it and National Plan Administrators operated as a single business enterprise. Second, CRS asserts that the evidence is insufficient to support a finding on the first element, which was submitted to the jury.

As to its first point, CRS did not object to the trial court that the jury question omitted the complained-of elements. Therefore, this complaint has not been preserved for review. *See* Tex. R. App. P. 33.1; *Brown*, 601 S.W.2d at 938; *Davis*, 572 S.W.2d at 663. As a result, and mindful that CRS failed to preserve its complaint that article 2.21 controlled in this case, we note that appellate courts do not review the sufficiency of the evidence against an allegedly proper question and instruction if the defect was never brought to the court's attention and the question or instruction never requested. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). It is the court's charge, not some

41

other unidentified law, that measures the sufficiency of the evidence when a party fails to object to the charge. *See* Tex. R. Civ. P. 272, 274, 278, 279; *Osterberg*, 12 S.W.3d at 55. Thus, we will turn to CRS's second point and consider the legal and factual sufficiency of the evidence supporting the jury's finding on the charge as submitted, bearing in mind the standards of review we set forth above.

The jury charge in this case asked the jury to determine if National Plan Administrators and CRS operated as a single business enterprise. It further instructed that the jury could

> consider the following factors for determining whether or not several corporations are a single-business enterprise, with no one factor being determinative or absolutely required:
>
> a. common employees;
> b. common offices;
> c. centralized accounting;
> d. payment of wages by one corporation to another's employees;
> e. services rendered by the employees of one corporation on behalf of another corporation;
> f. unclear allocation of profits and losses between corporations;
> g. common goals and purposes;
> h. common ownership;
> i. parties transacting with corporations reasonably believed there existed only "one" real corporation;
> j. corporations represented themselves to be one enterprise;
> k. one corporation involved itself in the day-to-day affairs of another corporation;
> l. one person collects revenues for all corporations in the enterprise;
> m. interlocking officers and/or directors
> n. all bookkeeping handled by one corporation; and
> o. common ownership of property.

The jury answered in the affirmative.

CRS and National Plan Administrators operate under two separate insurance licenses. No evidence in the record shows that they maintained common bank accounts or submitted common annual financial statements to the department of insurance. However, we also observe that the agreements between National Health and National Plan Administrators were all signed by Sommerlatte on behalf of National Plan Administrators. CRS was not a party to any agreement but was mentioned only as National Plan Administrators's agent for the purpose of receiving commissions for marketing National Health policies. In fact, National Plan Administrators was the only party that contracted with National Health to perform any marketing services. Evidence in the record reveals that Sommerlatte owns all shares of CRS, and CRS owns National Plan Administrators. Both entities shared offices in common, they owned common computer systems, and maintained common accounting systems. In general, National Plan Administrators administered plans marketed by CRS. This arrangement formed the basis for part of CRS's marketing strategy—CRS could negotiate with employers to accept more CRS-marketed products because the National Plan Administrators could absorb a greater burden of the administrative work through the common remitter system. While most companies in this kind of relationship would keep administrative and marketing services distinct and separate, Sommerlatte offered the CRS-National Plan Administrators relationship as a reason to contract with National Plan Administrators. That is, the common remitter system he developed could open larger markets and allow insurers to sell more policies because CRS and National Plan Administrators would manage not only the administration for the insurer but also for the employer for all types of policies underwritten by one insurer. Thus, a school district employer would send only one bulk premium check, and CRS-National Plan

Administrators would then separate out policy groups and then individual premiums, and pay commissions to agents itself.

When in negotiations with National Health in 1995, Sommerlatte outlined the proposed agreement on National Plan Administrators's letterhead. In that letter, he referred to his employees as "employees of NPA/CRS" and to the rights and obligations of CRS and National Plan Administrators in the first-person plural, "we." He also stated that he would use National Plan Administrators's letterhead for all correspondence related to its agreement with National Health. Correspondence from Sommerlatte to National Health concerning CRS marketing operations were also similarly produced on National Plan Administrators's letterhead. In addition, in several letters to National Health on National Plan Administrators's letterhead, Sommerlatte was at best unclear concerning which organization he was representing because he would refer both to marketing and to administrative functions. Letters from Hartford describing their ongoing negotiations with Sommerlatte to take over the National Health actively-at-work policies indicate that its impression was that, by negotiating with Sommerlatte, they were in fact working both with CRS and National Plan Administrators, "two firms that market and administer a cancer program." In fact, by his own testimony Sommerlatte negotiated the Hartford deal simultaneously for both companies, even though each entity ultimately held separate agreements with Hartford.

At trial, Sommerlatte did not distinguish between the functions of the two companies, and he testified as to his actions without distinguishing between his role as owner of CRS and president of National Plan Administrators. For example, when describing contract negotiations he conducted with National Health, he described those negotiations from the viewpoint of CRS and

44

spoke of reserving CRS's right to market for other insurers. However, as is clear from the record, the signed agreement in this case was only between National Health and National Plan Administrators. Also, when describing negotiations with Hartford or the process by which he communicated with agents about Hartford's offer to accept National Health policies, Sommerlatte is at best unclear as to whether he is speaking of CRS or National Plan Administrators. Considering the record as a whole and the events as they unfolded in this case, we find the evidence legally and factually sufficient for the jury to determine that CRS and National Plan Administrators operated as a single business enterprise, as charged by the court. We overrule CRS's first issue.

### *Article 41.006 of the Texas Civil Practice & Remedies Code*

In its second issue, CRS argues that the trial court erred in assessing punitive damages against it because article 41.006 bars an award of exemplary damages based on a theory of joint and several liability. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.006 (West 1997).[24]

The single-business-enterprise doctrine is an equitable theory by which courts disregard the corporate fiction and treat the entities as one. *Old Republic Ins. Co.*, 920 S.W.2d at 395-96. Because the jury found that CRS and National Plan Administrators operated as a single business entity, we disregard the corporate fiction and treat them as one entity. Thus, in equity the court did not err in assessing damages against both entities because they acted as one rather than as two defendants. Section 41.006 does not apply, and we overrule CRS's second issue.

---

[24] "In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant." Tex. Civ. Prac. & Rem. Code Ann. § 41.006 (West 1997).

45

## CONCLUSION

We have overruled all issues presented by appellants on appeal.  We affirm the judgment of the district court.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   September 10, 2004